# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE AMC ENTERTAINMENT HOLDINGS, INC. STOCKHOLDER LITIGATION | ) ) ) | Consol. C.A. No. 2023-0215-MTZ |

# MEMORANDUM OPINION

Date Submitted: July 26, 2023
Date Decided: August 11, 2023

Gregory V. Varallo, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, Wilmington, Delaware; Mark Lebovitch, Edward Timlin, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, New York; Michael J. Barry, Kelly L. Tucker, Jason M. Avellino, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Thomas Curry, SAXENA WHITE P.A., Wilmington, Delaware, *Attorneys for Plaintiffs Allegheny County Employees' Retirement System and Anthony Franchi.*

Raymond J. DiCamillo, Kevin M. Gallagher, Matthew W. Murphy, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John A. Neuwirth, Joshua S. Amsel, Tanner S. Stanley, WEIL, GOTSHAL & MANGES LLP, New York, New York, *Attorneys for Defendants AMC Entertainment Holdings, Inc., Adam M. Aron, Denise Clark, Howard W. Koch, Jr., Kathleen M. Pawlus, Keri Putnam, Anthony J. Saich, Philip Lader, Gary F. Locke, Lee Wittlinger, and Adam J. Sussman.*

**ZURN, Vice Chancellor.**

Common stockholders of AMC Entertainment Holdings, Inc. ("AMC" or the "Company") brought direct claims on behalf of a putative class of common stockholders, and have reached a settlement with the defendants, AMC's directors and the Company.

The settlement consideration consists of additional shares of common stock awarded to current common stockholders to offset the dilutive effects of the conduct underlying the plaintiffs' claims. In return, the plaintiffs and defendants suggest the class should release claims relating to that conduct. As Delaware law requires, the parties submitted the settlement terms to the Court for approval. The plaintiffs' counsel have also requested fees based on the settlement's benefit to AMC's stockholders.

This is my second opinion considering the settlement terms. The first was issued on July 21, 2023, and declined to approve the settlement because the release was unsound (the "July 21 Opinion").[1] This opinion adopts the defined terms used in the July 21 Opinion, assumes the parties' familiarity with the July 21 Opinion, and refers readers to that decision for the necessary background regarding the underlying transactions and this litigation.

The day after the July 21 Opinion, the parties cut the offending provision from

---

[1] *In Re AMC Ent. Hldgs., Inc. S'holder Litig.*, --- A.3d ---, 2023 WL 4677722 (Del. Ch. July 21, 2023). The July 21 Opinion is also available at Docket Item ("D.I.") 581.

1

the release and asked the Court to consider the settlement as revised. This opinion considers that revised settlement.

The Court's consideration of a proposed settlement comprises four tasks. First, the Court must determine whether the class should be certified under Court of Chancery Rule 23, and if it should be certified as opt-out or non-opt-out. In this opinion, I certify the class as a non-opt-out class under Rules 23(a), 23(b)(1), and 23(b)(2). I decline to afford the right to opt out.

Second, the Court must review the adequacy of notice of the proposed settlement to the class. I conclude the notice was sufficient and its delivery was adequate. Under Delaware law, only stockholders of record are required to receive notice when the class is certified as a non-opt-out class. Here, comprehensive electronic notice, coupled with supplemental but imperfect postcard notice, was adequate notice under Delaware law.

Third, the Court must review the terms of the proposed settlement for reasonableness, and determine whether to approve it. I conclude the settlement is reasonable. While the plaintiffs' fiduciary duty claim had merit, a remedy for that claim that is equitable and beneficial to the class overall is challenging to identify. The plaintiffs' statutory claim had no merit. The release of those claims, and others with the identical factual predicate to the plaintiffs' complaints, is sufficiently supported by the settlement consideration.

And finally, if the settlement is approved, the Court must resolve the plaintiffs' petition for an award of attorney's fees and expenses. I award plaintiffs' counsel fees worth 12% of the settlement consideration. The plaintiffs' requests for modest incentive awards is granted.

An objector moved for a stay pending appeal if the settlement was approved, indicating an intention to appeal the July 21 Opinion's holding that the release does not improperly release future claims. This opinion concludes such a stay would not be appropriate.

## I.  BACKGROUND[2]

The day after the July 21 Opinion, the parties amended the release in the

---

[2] Citations in the form of "D.I. —" refer to docket items in *In re AMC Entertainment Holdings, Inc. Stockholder Litigation*, C.A. No. 2023-0215-MTZ (Del. Ch.), formerly *Allegheny County Employees' Retirement System v. AMC Entertainment Holdings, Inc., et al.*, C.A. No 2023-0215-MTZ (Del. Ch.). Citations in the form of "2023-0216, D.I. —" refer to docket items in *Usbaldo Munoz, et al. v. Adam M. Aron, et al.*, C.A. No. 2023-0216-MTZ (Del. Ch.). Citations in the form of "Hr'g Tr. —" refer to the Settlement Hearing held on June 29 and 30, 2023. D.I. 578; D.I. 579.

The facts are drawn from the allegations of the Allegheny complaint, the operative complaint, "from the affidavits and supporting documents submitted in connection with the application for court approval," and public filings. D.I. 1 [hereinafter "Non-Op. Compl."]; 2023-0216, D.I. 1 [hereinafter "Op. Compl."]; *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1030 (Del. Ch. 2015); *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))); *accord Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004) (holding that the court may take judicial notice of public documents such as SEC filings that are required by law to be filed).

Proposed Settlement.[3]  They filed a joint letter asking the Court to take the revised

terms under advisement without requiring additional formal notice to the putative

class, to continue to stay proceedings against the defendants, and to ultimately

approve the Proposed Settlement.[4]  AMC announced the amendment the next

business day, July 24.[5]

That same day, objector Rose Izzo filed a "Motion for Clarification of the

Scheduling Order or, Alternatively, for Maintaining of Status Quo Order Pending

Appeal."[6]  Izzo reiterated her desire to become lead plaintiff and sought clarification

as to whether the July 21 Opinion was a "final determination" so she could "file a

prompt motion to intervene."[7]  If the July 21 Opinion was not a "final

---

[3] D.I. 582.

[4] *Id.* at 2–3 & n.1.

[5] AMC Entertainment Holdings, Inc., Current Report (Form 8-K) (July 24, 2023) ("On July 22, 2023, the parties filed an addendum to the Stipulation in an effort to address the issues with the scope of the release raised by the Court and requested that the Court approve the settlement with the revised release set forth in the addendum.").  AMC and Plaintiffs' counsel posted the parties' July 22 letter on their respective websites.  Presentations, AMC THEATRES INVESTOR RELATIONS, https://investor.amctheatres.com/financial-performance/presentations/default.aspx (last visited Aug. 9, 2023); *Settlement Information*, GRANT & EISENHOFER, P.A., https://www.gelaw.com/settlements/amc (last visited Aug. 9, 2023); *AMC Case Documents*, FIELDS KUPKA & SHUKUROV LLP, https://fksfirm.com/case-notices/ (last visited Aug. 9, 2023); *Related Cases*, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, https://www.blbglaw.com/news/updates/2023-04-03-blbg-secures-additional-shares-for-amc-stockholders-in-landmark-recapitalization-settlement (last visited Aug. 9, 2023).

[6] D.I. 583.

[7] *Id.* ¶¶ 2–3, 5.

4

determination," Izzo sought a stay pending appeal if the Proposed Settlement were approved.[8]

Later that day, the Court granted the parties' request to stay proceedings against the defendants pending this Court's consideration of the Proposed Settlement; concluded no additional notice was necessary; explained the July 21 Opinion was not a final determination; directed the parties to respond to Izzo's motion to stay this action pending appeal; and requested supplemental briefing "on the effect of the Delaware Supreme Court's June 28, 2023 decision in *Coster v. UIP Companies, Inc.* on the Proposed Settlement and [P]laintiffs' breach of fiduciary duty claim."[9] I also asked the parties to "advise, with as much detail as possible, as to any events or circumstances compelling a decision by a certain date."[10] On July 25 and 26, the parties responded.[11] On July 31, Izzo filed her reply in support of her

---

[8] *Id.* ¶¶ 6, 15.

[9] D.I. 587 at 6 (citing *Coster v. UIP Cos., Inc.* (*Coster IV*), --- A.3d ---, 2023 WL 4239581 (Del. 2023)).

[10] *Id.* at 5.

[11] D.I. 589; D.I. 591; D.I. 592; D.I. 593; D.I. 595. My letter also highlighted the parties' delay in addressing the issue with the Release that I had raised at the hearing on June 29. The parties did not respond on that point; instead, the defendants requested a decision on the recut settlement by "the late part of July or early August." D.I. 595 at 2, 4. This is the most recent example of the parties' habit of moving slowly while pressing this Court for expedited treatment. *See, e.g.*, D.I. 163 (writing to the parties to ask if they were going to file the settlement papers for the proposed settlement they had announced nearly two weeks prior), *with* D.I. 217 at 18–19 (asking the Court to "truncate" the settlement schedule); D.I. 59 ¶ 3 (asking the Court to lift the status quo order "so the issuance of new shares to Common Stockholders can take place at the earliest possible date"); *id.* ¶¶ 20, 32 (seeking

motion.[12]

Aside from the addendum to the Stipulation and the supplemental briefing I requested, the record closed on June 30.[13] I have not considered efforts to cure noncompliant Objections or other submissions after that date.[14]

## II.    ANALYSIS

"Although Delaware law has traditionally favored a voluntary settlement of contested claims, the settlement of claims raised in a class action require certain safeguards to 'insure that the interests of parties who are before the Court only vicariously are not inequitably abrogated.'"[15] Under Court of Chancery Rule 23(e), "class action[s] shall not be dismissed or compromised without the approval of the

---

performance of the proposed settlement "at the earliest possible date," including before noticing the settlement and receiving Court approval under Rule 23). Despite the parties' torpor, I have done my best to issue this opinion quickly.

[12] D.I. 604.

[13] D.I. 570.

[14] *See, e.g.*, D.I. 603.

[15] *Rinaldi v. Iomega Corp.*, 2001 WL 34890424, at *5 (Del. Super. June 29, 2001) (citations omitted) (citing *Nottingham P'rs v. Dana*, 564 A.2d 1089, 1102 (Del. 1989), and *Polk v. Good*, 507 A.2d 531, 535 (Del. 1986), and then quoting Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9-4[a] (2000))); *id.* ("If settlements of pending litigation are the cherished offspring of the law, settlements of representative actions are no doubt the least ingratiating of the brood." (quoting Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9-4[a] (2000))); 2 Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 13.03[a] at 13-11 (2d ed. 2022) (same).

6

Court, and notice . . . to all members of the class."[16] The Court must consider

whether the terms of the settlement are fair and reasonable, recognizing that "[t]his

Court generally favors settlement of complicated litigation."[17]

"When parties have reached a negotiated settlement, the litigation enters a

new and unusual phase where former adversaries join forces to convince the court

that their settlement is fair and appropriate."[18] "The settlement's proponents bear

the burden of persuasion by a preponderance of the evidence."[19] "[I]n most

instances, the court is constrained by the absence of a truly adversarial process, since

inevitably both sides support the settlement and legally assisted objectors are rare."[20]

---

[16] Ct. Ch. R. 23(e).

[17] *Gatz v. Ponsoldt*, 2009 WL 1743760, at *2 (Del. Ch. June 12, 2009) (citing *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *10 (Del. Ch. Mar. 31, 2009)); *accord id.* ("However, the settlement of a class action is unique because the fiduciary nature of the class action requires the Court of Chancery to participate in the consummation of the settlement to the extent of determining its intrinsic fairness." (alterations and internal quotation marks omitted) (quoting *Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964), and citing *Nottingham*, 564 A.2d at 1102)).

[18] *Ginsburg v. Phila. Stock Exch., Inc.*, 2007 WL 2982238, at *1 (Del. Ch. Oct. 9, 2007); *cf. In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 893 (Del. Ch. 2016) ("Once an agreement-in-principle is struck to settle for supplemental disclosures, the litigation takes on an entirely different, non-adversarial character. Both sides of the caption then share the same interest in obtaining the Court's approval of the settlement." (footnote omitted)).

[19] *In re TD Banknorth*, 938 A.2d 654, 658 n.4 (Del. Ch. 2007) (citing *In re First Boston, Inc. S'holders Litig.*, 1990 WL 78836, at *9 (Del. Ch. Jun. 7, 1990)).

[20] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 961 (Del. Ch. 1996).

Typically, the Court considers whether to approve a settlement in steps.[21] First, it determines whether it can certify the putative class under Rules 23(a) and 23(b). If the Court certifies a class, it next examines whether the notice of the settlement that the parties provided to the class was sufficient to satisfy the requirements of due process. If it finds that notice was adequate, it moves on to considering whether the settlement terms fall within a range of reasonableness. If they do, then the Court will approve the settlement. Only then will the Court determine whether to award fees and expenses to the plaintiff's counsel and incentive awards to the representative plaintiff.

For the reasons that follow, this opinion concludes: the class is certified under Rules 23(a), 23(b)(1), and 23(b)(2); an opt-out right is not warranted given the Proposed Settlement's structure; notice was adequate; the Proposed Settlement is reasonable; counsel earned monetary fees equal to 12% of the consideration at the time the consideration is paid; and incentive awards are granted out of that fee award.

---

[21] *See, e.g.*, *Activision*, 124 A.3d at 1043 ("The tasks assigned to the court include (i) confirming that the Settlement is properly structured, (ii) ensuring that adequate notice has been provided, (iii) assessing the reasonableness of the 'give' and the 'get,' as well as the allocation of the 'get' among various claimants, (iv) approving an appropriate award of attorneys' fees, and (v) authorizing any payment from the fee award to the representative plaintiff."); *CME Grp., Inc. v. Chi. Bd. Options Exch., Inc.*, 2009 WL 1547510, at \*4 (Del. Ch. June 3, 2009) ("The Court starts with consideration of whether class certification is appropriate and whether the Settlement in gross should be approved. It then turns its attention to the various specific objections to the terms of the Settlement.").

### A. Objections To The Proposed Settlement And Exceptions To The Special Master's Report

Once again, the Court expresses gratitude to the Special Master and her team, whose hard work was described more fully in the July 21 Opinion. That opinion also describes the requirements to submit a compliant Objection to the Proposed Settlement and compliant exception to the Special Master's Report. As noted there, thirteen exceptions to the Report were timely filed; ten were compliant.[22] That opinion addressed only the release of APE claims; because no compliant Objection raised the issue of APE claims being included in the Release, the compliant Objections and exceptions did not inform that decision.[23] The July 21 Opinion did

---

[22] *AMC*, --- A.3d ---, 2023 WL 4677722, at *27 & n.204; D.I. 580 ¶ 7. *See also infra* (discussing Karen Grelish's exception's compliance).

On July 24, Brian Tuttle filed a letter arguing the Court improperly categorized his Objection as non-compliant, and requesting that the Court consider an earlier filing, D.I. 573, as an Objection "to the *amended* settlement." D.I. 584 at 1 (emphasis in original). Tuttle has already filed exceptions asserting he submitted a compliant objection, and the Court ruled he failed to comply with the proof of ownership requirements. *AMC*, --- A.3d ---, 2023 WL 4677722, at *27 n.204. The Court is not accepting objections to the revised Proposed Settlement, so Tuttle's request to treat another filing as an objection is denied. D.I. 587 at 6 (citing *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 313 (D.D.C. 2015)).

[23] *E.g.*, *In re Cent. Banking Sys., Inc.*, 1993 WL 410421, at *2 n.2 (Del. Ch. Oct. 6, 1993) ("Rafton objected on other grounds as well, but those grounds are not relevant to the issue being decided here."); *Goldman v. Aegis Corp.*, 1982 WL 525016, at *2–3 (Del. Ch. May 3, 1982) (objections based on issues "not before [the] [c]ourt" are "without merit"); *cf. Trulia*, 129 A.3d at 907 n.90 ("Because I reject the proposed settlement, I do not address the issue of class certification, although stockholder classes in cases such as this are typically certified.").

dismiss exceptions asserting the Special Master failed to give each Objection due attention.[24]

On July 27, stockholder Karen Grelish submitted a filing contesting the July 21 Opinion's finding that her Objection, and thus her exception, were noncompliant.[25] The next day, I stated I was treating her filing as a motion for reconsideration and set a briefing schedule pursuant to Rule 59(f).[26] On August 4, Plaintiffs filed a response making clear that Grelish's Objection was compliant under the more lenient standards summarized in the July 21 Opinion, her Objection was filed without including the proof of ownership she submitted, and "[d]ue to an error flowing from [her] multiple submissions," only Grelish's non-Objection communications were provided to the Special Master.[27] I thank Plaintiffs for this clarification, and will consider Grelish's exception as compliant.

The compliant exceptions touch on a range of issues, including but not limited to: the adequacy of the notice, with a focus on postcard notice;[28] the strength of the

---

[24] *AMC*, --- A.3d ---, 2023 WL 4677722, at *28.

[25] *Id.* at *27 n.204; D.I. 598.

[26] D.I. 600.

[27] D.I. 608 ¶¶ 4–5; *id.* ¶ 5 ("On June 22, 2023, Plaintiffs' counsel filed the Grelish Objection on the public docket, at her request. While it was filed without proof of ownership, also at Ms. Grelish's request and per the Court's prior guidance, Plaintiffs' submissions noted her proof of ownership." (footnotes omitted)); *see AMC*, --- A.3d ---, 2023 WL 4677722, at *28 & n.213. The parties do not object to the Court considering Grelish's exception. D.I. 608 ¶ 2; D.I. 609.

[28] *See, e.g.*, D.I. 560 at 1–2; D.I. 565 at 4.

claims and the value of the claims being released, or the "give" as compared to the "get";[29] the Special Master's categorization of some purported stockholder correspondence as "inquiries";[30] the Special Master's decision to give little weight to the volume of Objections;[31] Plaintiffs' counsel's fee award;[32] and whether the Special Master adequately reviewed and assessed each Objection.[33]  Some exceptions are largely untethered from the Report,[34] or misunderstand the applicable standards in evaluating the reasonableness of a proposed settlement.[35]

I have conducted my own de novo analysis of the issues addressed in this opinion.  I have also considered each compliant exception to the Special Master's Report de novo, to the extent relevant to my decision today.[36]  My analysis follows.

### B.    Class Certification

I begin with Rule 23.  "[C]lass certification involves a 'two-step analysis.' The first step, a prerequisite for class action certification, is that the action satisfy

---

[29] *See, e.g.*, D.I. 546 at 4 ¶ 5; D.I. 547 ¶¶ 2–13; D.I. 556 [hereinafter "Izzo Exc."], at 10–28; D.I. 558 at 3–21; D.I. 565 at 5–9.

[30] D.I. 552 at 3; *see also* D.I. 565 at 5.

[31] *See, e.g.*, D.I. 547 ¶ 14; Izzo Exc. at 28–32; D.I. 565 at 5.

[32] *See, e.g.*, Izzo Exc. at 38–42.

[33] *See, e.g.*, D.I. 547 ¶ 16; D.I. 553 ¶¶ 1, 5; D.I. 565 at 4–5.

[34] *See, e.g.*, D.I. 546; *id.* at 1 (stating he did "not read [the Special Master's] recommendation in its entirety").

[35] *See, e.g.*, D.I. 558.

[36] *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).

11

each of the four requisites of Rule 23(a) . . . .    The second step . . . requires determining whether the class action falls into one of three categories delineated in Rule 23(b)."[37]

### 1.        Court Of Chancery Rule 23(a)

For a class to be certified, "(1) the class [must be] so numerous that joinder of all members is impracticable, (2) there [must be] questions of law or fact common to the class, (3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and (4) the representative parties [must] fairly and adequately protect the interests of the class."[38]  Settlement proponents bear the burden of establishing each certification element.[39]   To the extent exceptions engaged with Rule 23(a), they focused on whether Plaintiffs can fairly and adequately represent the class.[40]

---

[37] *Leon N. Weiner & Assocs., Inc. v. Krapf*, 584 A.2d 1220, 1224 (Del. 1991) (quoting and citing *Nottingham*, 564 A.2d at 1094–95).

[38] Ct. Ch. R. 23(a).

[39] *Dieter v. Prime Comput., Inc.*, 681 A.2d 1068, 1071 (Del. Ch. 1996) (citing *Rosen v. Juniper Petroleum Corp.*, 1986 WL 4279, at *1 (Del. Ch. Apr. 11, 1986)).

[40] *See, e.g.*, Izzo Exc. at 32–35.

### a)  Numerosity

Rule 23(a)(1)'s numerosity requirement may be satisfied by "numbers in the proposed class in excess of forty, and particularly in excess of one hundred."[41]  As of the February 8, 2023 record date for the Special Meeting, there were over 517 million shares of common stock outstanding.[42]  Strategic Claims Services served as the "Notice Administrator" and "mailed . . . post card notice to 16,382 record holders," and "mailed or emailed approximately 2.8 million post card notices to beneficial holders of AMC Common Stock."[43]  Joinder of the diffuse holders of hundreds of millions of shares is not practical.  Numerosity is satisfied.

### b)  Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."[44]  Commonality is "met where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals

---

[41] *Marie Raymond Revocable Tr. v. MAT Five LLC*, 980 A.2d 388, 400 (Del. Ch. 2008) (internal quotation marks and footnote omitted) (collecting authorities), *aff'd sub nom. Whitson v. Marie Raymond Revocable Tr.*, 976 A.2d 172 (Del. 2009).

[42] Op. Compl. ¶ 155; D.I. 200, Defendants' Brief in Support of Proposed Settlement [hereinafter "DOB"], Ex. W, AMC Entertainment Holdings, Inc., Proxy Statement (Schedule 14A) (Feb. 14, 2023) [hereinafter "Feb. 14, 2023 Proxy"], at 4.

[43] D.I. 442, Affidavit of Paul Mulholland Concerning Mailing of Post Card Notice [hereinafter "Mulholland Aff."], ¶¶ 4, 7; D.I. 531, Affidavit of Josephine Bravata Concerning Mailing of Post Card Notice [hereinafter "Bravata Aff."], ¶ 4.  The exhibits to the Mulholland and Bravata Affidavits are available at D.I. 443 and D.I. 531, respectively.

[44] Ct. Ch. R. 23(a)(2).

are not identically situated."[45] "Commonality is not defeated merely because the class members may have different interests and views, so long as the common legal questions are not dependent on divergent facts and significant factual diversity does not exist among individual class members."[46]

Here, common questions of law include whether: (i) the defendants breached their fiduciary duties by (a) "coercing stockholders to vote with respect to the Certificate Proposals," (b) "attempting to circumvent the franchise of the holders of the Common Stock," (c) "transferring economic value from members of the Class to Antara and other holders of APEs"; (ii) "fail[ing] to seek approval from the common stockholders as a class for the creation and issuance of the Preferred Stock" violated Section 242(b); and (iii) Plaintiffs and the class have been injured by the defendants' conduct.[47] Commonality is satisfied.

### c) Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[48] "The test of typicality is that the legal and factual position of the class representative must not be markedly different

---

[45] *Krapf*, 584 A.2d at 1225 (citations and internal quotation marks omitted).

[46] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co.*, 2022 WL 2255258, at *6 (Del. Ch. June 23, 2022) (internal quotation marks omitted) (quoting *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1141 (Del. 2008)).

[47] Op. Compl. ¶ 156; Non-Op. Compl. ¶ 102.

[48] Ct. Ch. R. 23(a)(3).

14

from that of the members of the class" and "focuses on whether the class representative claim (or defense) fairly presents the issues on behalf of the represented class."[49] "Factual differences between the claims of the named plaintiffs and the other class members do not necessarily preclude typicality."[50]

Plaintiffs, as common stockholders, are similarly situated to the other unaffiliated holders of common stock and their claims "arise[] from the same event or course of conduct that gives rise to the claims . . . of other class members and [are] based on the same legal theory."[51] That objectors proposed additional legal theories for claims Plaintiffs did not raise does not mean that Plaintiffs' claims are atypical.[52] Plaintiffs' claims are typical of those of the class.

### d) Fair And Adequate Representation

Under Rule 23(a)(4), I must determine that the proposed plaintiff class representatives and their counsel "will fairly and adequately protect the interests of

---

[49] *Krapf*, 584 A.2d at 1225–26 (citations and internal quotation marks omitted).

[50] *Sheftelman v. Jones*, 667 F. Supp. 859, 863 (N.D. Ga. 1987) (citation omitted). "Judicial interpretation of the Federal Rules respecting class actions . . . [is] persuasive authority for the interpretation of Court of Chancery Rule 23." *Buttonwood*, 2022 WL 2255258, at *3 (internal quotation marks omitted) (quoting *Countrywide*, 2009 WL 846019, at *12 n.84).

[51] *Krapf*, 584 A.2d at 1226 (citation omitted).

[52] *Cf. Angelastro v. Prudential-Bache Sec., Inc.*, 113 F.R.D. 579, 582 (D.N.J. 1986) ("This is not to say, as we discuss in greater detail below, that plaintiff's claim is identical with that of the other putative class members. Rather, it simply means that plaintiff's circumstances do not appear to be so unique as to preclude class treatment.").

the class."[53]  "Delaware courts have articulated a three-part test to establish the adequacy of the class representatives":  (1) "the representative[s'] interests must not be 'antagonistic to the class'"; (2) "the plaintiffs must retain 'competent and experienced counsel to act on behalf of the class'"; and (3) " the class representatives must 'possess a basic familiarity with the facts and issues involved in the lawsuit.'"[54]

"[D]etermination of the adequacy of a class representative is an 'essential component' of the settlement approval process."[55]  "In an application of the fourth prerequisite of Rule 23(a), the predominant considerations are due process related: (i) that there be no conflict between the named party and the other class members; and (ii) that the named party may be expected to vigorously defend not only themselves but the proposed class."[56]  "The adequacy requirement 'attempts to

[53] Ct. Ch. R. 23(a)(4).

[54] *Buttonwood*, 2022 WL 2255258, at *10 (quoting *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 127 (Del. Ch. 1999)).  In the absence of substantiated argument or evidence to the contrary, I find Plaintiffs possess sufficient familiarity with this litigation. *See, e.g.*, D.I. 3, Verification of Walter Szymanski in Support of Verified Class Action Complaint [hereinafter "Allegheny Verif."], ¶¶ 4–5; D.I. 206, at Affidavit of Walter Szymanski of Allegheny County Employees Retirement System in Support of Proposed Settlement, Application for Attorneys' Fees and Expenses, and Incentive Award for Plaintiffs [hereinafter "Allegheny Aff."], ¶¶ 3–6; 2023-0216, D.I. 1 at Affidavit and Verification of Anthony Franchi in Support of Verified Stockholder Class Action Complaint [hereinafter "First Franchi Aff."], ¶¶ 2–3; D.I. 206, at Affidavit of Anthony Franchi in Support of Proposed Settlement, Application for Attorneys' Fees and Expenses, and Incentive Award for Plaintiff [hereinafter "Second Franchi Aff."], ¶¶ 3–5.

[55] *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 291 (Del. 2002) (quoting *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d at 1039, 1045 (Del. 1996)).

[56] *Krapf*, 584 A.2d at 1225.

ensure that the class representative has proper incentives to advance the interests of the class,' and 'speaks to alignment of interests' among the named and unnamed class members."[57] "The class representative need not be 'the best of all representatives, but [rather] one who will pursue a resolution of the controversy in the interests of the class.'"[58] Once prima facie adequacy is established, the burden shifts to the nonmovant, i.e. objectors, to disqualify the plaintiff.[59]

Plaintiffs are adequate to represent the interests of the class. As defined, the settlement class includes all stockholders who held shares of AMC common stock "at any time between August 3, 2022 through and including the Settlement Class Time."[60] "Allegheny is the beneficial owner of shares of AMC Entertainment

---

[57] *Buttonwood*, 2022 WL 2255258, at *9 (quoting *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *14 (Del. Ch. Mar. 23, 2012), *aff'd in relevant part, rev'd in part*, 59 A.3d 418 (Del. 2012)).

[58] *Id.* (quoting *Price v. Wilm. Tr. Co.*, 730 A.2d 1236, 1238 (Del. Ch. 1997)).

[59] *See Van de Walle v. Unimation, Inc.*, 1983 WL 8949, at *4–5 (Del. Ch. Dec. 6, 1983).

[60] D.I. 537 at 4; *see also* D.I. 165 [hereinafter "Stip."], ¶ A.1(d) ("'Class Period' means the period from August 3, 2022 through and including the Settlement Class Time."); *id.* ¶ 1(w) ("'Settlement Class' means a non-opt-out class for settlement purposes only, and pursuant to Court of Chancery Rules 23(a), 23(b)(1), and 23(b)(2), consisting of all holders of Common Stock during the Class Period . . . ."); D.I. 185, Ex. 1 [hereinafter "Notice"], ¶ 29 ("The 'Settlement Class' means all holders of AMC Common Stock between August 3, 2022, through and including the Settlement Class Time, whether beneficial or of record, including the legal representatives, heirs, successors-in-interest, transferees, and assignees of all such foregoing holders, but excluding Defendants. 'Settlement Class Time' means the record time, expected to be set as of the close of business in accordance with any New York Stock Exchange and/or Depository Trust Company requirements or policies, on the business day prior to Conversion on which the Reverse Stock Split is effective. Put slightly differently, if you owned AMC Common Stock between August 3, 2022, through and

17

Holdings, Inc. common stock and has held such shares continuously since December 16, 2015."[61] Franchi is a common stockholder that holds no APE units.[62] In a sense, his holdings make him better suited to represent the claims of the common because he does not hold competing APE interests.[63] Franchi has previously shown he is willing and able to lead a representative action to a recovery.[64] Allegheny has also served as a lead plaintiff in a class action.[65]

The Special Master concluded the objectors did not carry their burden to disqualify Plaintiffs as adequate class representatives.[66] One objector, Izzo, took exceptions to that recommendation.[67] Izzo makes two arguments in support of her

---

including the time after the Reverse Stock Split is effected, but before the Conversion, you are a member of the Settlement Class.").

[61] Allegheny Aff. ¶ 2; Allegheny Verif. ¶ 2 ("[Allegheny] is the beneficial owner of shares of AMC Entertainment Holdings, Inc. common stock and has held such shares continuously since December 16, 2015, and AMC Preferred Equity Units ('APEs') and has held such units continuously since August 22, 2022." (emphasis omitted)); D.I. 521 ¶¶ 2, 4–5.

[62] D.I. 450, at Exhibit 2 to the Corrected Transmittal Affidavit of Thomas Curry in Support of Plaintiffs' Reply in Further Support of Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards [hereinafter "Izzo Obj."], at 14 ("Discovery shows that he owns only 32 shares of Common stock and no Preferred." (citing Franchi_0000000001)); *see also* First Franchi Aff. ¶ 1; Second Franchi Aff. ¶ 2.

[63] *See AMC*, --- A.3d ---, 2023 WL 4677722, at *13.

[64] *E.g.*, *In re Multiplan Corp. S'holders Litig.*, 2023 WL 2329706 (Del. Ch. Mar. 1, 2023) (ORDER); *Franchi v. Barabe*, 2022 WL 3043899 (Del. Ch. Aug. 1, 2022) (ORDER).

[65] *E.g.*, *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 2020 WL 815136 (E.D. Pa. Feb. 19, 2020).

[66] D.I. 518 [hereinafter "Rpt."], at 66–70.

[67] Izzo Exc. at 32–35.

exceptions. First, Izzo disagrees with the Report's determination that *Prezant v. De Angelis*[68] does not render Plaintiffs inadequate. Izzo relied on that case to argue Plaintiffs are inadequate because they seek an outcome—the Proposed Settlement, which would permit the Proposals and the Conversion—that many AMC stockholders oppose.[69]

In *Prezant*, this Court approved a class action settlement of a second-filed consolidated Delaware action while a first-filed Illinois action against the same defendants remained pending.[70] The Illinois plaintiffs, some of whom were plaintiffs in the Delaware action, had rejected a settlement offer similar to the offer Delaware plaintiff De Angelis accepted.[71] The trial court approved the settlement in spite of "highly suspicious" "deficiencies in the settlement process," but "did not make an explicit determination that De Angelis is an adequate representative of the class he purports to represent. Indeed, defendants concede[d] that it can be inferred from the Vice Chancellor's findings that De Angelis is an *inadequate* representative

---

[68] 636 A.2d 915 (Del. 1994).

[69] Rpt. at 67 & n.214 (citing *Prezant*, 636 A.2d at 918–20, 926).

[70] 636 A.2d 915.

[71] *Id.* at 918, 924; *see also id.* at 920 (highlighting the fact that De Angelis's action "asserted only state common law fraud claims, which are not maintainable as a class action in Delaware;" the defendants did not seek to stay or dismiss the second-filed Delaware action; and the defendants did not challenge class certification as they did in Illinois (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467 (Del. 1992)).

19

of the class."[72]  An objector appealed.  Because the trial court failed to determine De Angelis's adequacy as a class representative before approving the proposed settlement, the Delaware Supreme Court reversed and remanded.[73]

Izzo interprets *Prezant* to hold that if other class members do not "desire" the relief sought or achieved, the representative plaintiff cannot be adequate.[74]  From there, Izzo argues that because more AMC common stockholders have spoken up to oppose the Settlement than to support it, Plaintiffs' support of the settlement makes them inadequate.  *Prezant* did not speak to any such numbers game:  it simply remanded for the trial court to make the adequacy determination Rule 23 requires.[75]  Izzo provides no other authority for the proposition that a representative plaintiff can be rendered inadequate simply because the settlement drew a large volume of

---

[72] *Id.* at 920, 926 (emphasis in original).

[73] *Id.* at 926.

[74] Izzo Exc. at 33; *id.* ("The Report . . . attempts to cabin *Prezant*'s instruction to cases in which a plaintiff seeks to settle claims brought by a pre-existing litigant in another court.  But *Prezant* contains no such limiting principle." (citing Rpt. at 67 n.214)).

[75] *Prezant*'s holding is clear:  "Accordingly, we do not believe that a class action settlement can constitutionally bind absent class members without a judicial determination that the adequate representation requirement of Rule 23(a)(4) has been satisfied."  636 A.2d at 924.  Izzo's exceptions present a different quotation as *Prezant*'s "holding," but the quote is drawn from a federal case, and *Prezant* simply relied on that federal language to explain why adequacy determinations are important in class actions.  Izzo Exc. at 32 & n.105 ("Izzo Obj. at 39 (quoting *Prezant v. De Angelis*, 636 A.2d 915, 924 (Del. 1994) (emphasis added, quotation omitted)).");  *id.* at 33 & n.107;  *see Prezant*, 636 A.2d at 923;  *id.* at 924 (quoting *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 344 (D.C. Cir. 1976)) (quoting *Dierks v. Thompson*, 414 F.2d 453, 456 (1st Cir. 1969))).

objections. The volume of objections is not indicative of their merit, and meritless objections do not demonstrate a disqualifying conflict.[76] The Court considers the merit of objections in assessing the reasonableness of the settlement terms, which I have done below. Izzo's exception based on *Prezant* is dismissed.

Izzo's second exception asserts that "the Report disregards the economic antagonism between the 'unlikely hero[es]' who saved AMC and the stockholders who purport to represent them."[77] As a threshold matter, Izzo takes issue with the fact that Franchi did not own AMC stock "'at the time of the wrongs complained of' in his Complaint."[78] But under Delaware law, direct claims like Plaintiffs' run with the stock, not the holder.[79] Under the parties' definition of "Settlement Class," since

[76] *See, e.g.*, *CME Grp.*, 2009 WL 1547510, at *5 n.26 ("The existence of material conflicts between the class representatives and members of the class would limit the Court's ability to conclude that the class representatives' efforts have been adequate within the meaning of Court of Chancery Rule 23(a)(4). A review of those alleged conflicts is best done within the context of assessing the merits of the objections. Because the Court will overrule those objections, *infra*, and conclude that the class representatives and their counsel discharged their responsibilities fairly and adequately and without any adverse consequences from what the objectors have perceived as potential conflicts, the requirements of Court of Chancery Rule 23(a)(4) have been satisfied."); *Youngman v. Tahmoush*, 457 A.2d 376, 380 (Del. Ch. 1983) ("The fact that the plaintiff may have interests which go beyond the interests of the class, but are at least co-extensive[] with the class interest, will not defeat his serving as a representative of the class. Similarly, purely hypothetical, potential or remote conflicts of interests never disable the individual plaintiff." (citation omitted)); *Buttonwood*, 2022 WL 2255258, at *10 (same).

[77] Izzo Exc. at 32 (quoting POB at 11).

[78] *Id.* at 34 (footnote omitted).

[79] *Cf. AMC*, --- A.3d ---, 2023 WL 4677722, at *21 ("Under Delaware law, direct claims for violating voting rights associated with stock ownership are appurtenant to the share of

21

Franchi purchased within the Class Period, he is a class member with standing to bring claims on behalf of the class.

From there, Izzo's argument is more qualitative. She insists Plaintiffs are inadequate because they "are not, and have never been, Apes,"[80] referring to the colloquial name AMC's retail common stockholders have given themselves. Izzo points out that Allegheny and Franchi own relatively few shares of common stock and fewer or no APE units, indicating they sold their APE units.[81] She argues that unlike "[t]he AMC stockholders who bought and held for the long term saved AMC—and suffered for it," Plaintiffs did not.[82]

Izzo also argues that Plaintiffs' previous service as representative plaintiffs renders them antagonistic to the interests of the class. Izzo describes Plaintiffs as "a

---

stock that carries the voting power; they are not personal rights belonging to the stockholder who happens to own the shares." (citing *Activision*, 124 A.3d at 1049, and *Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 677 (Del. 2020))). Plaintiffs' counsel has concisely explained why Franchi can assert Plaintiffs' claims under the *Activision* framework. D.I. 537.

[80] Izzo Exc. at 34; *see also* Izzo Obj. at 14 ("Franchi is no Ape[.]"); *id.* at 15 ("Franchi's tiny, late-purchased position may be atypical of Apes, but it is consistent with his history of federal and state court litigation."); *id.* at 16 ("Allegheny is a pension fund, not an Ape— and in fact purports to own fewer Common shares than Ms. Izzo."); *cf. id.* at 18 ("Ms. Izzo, meanwhile, is an Ape to the core.").

[81] Izzo Exc. at 34–35.

[82] *Id.* at 35; *see also* Hr'g Tr. 154. While Izzo critiques Plaintiffs' trading patterns, including Allegheny's sales, her exceptions do not address her own stock sales, which the parties raised. Izzo Exc. 34–35; D.I. 485 ¶ 1 (disclosing Izzo owns more APE units than common stock because she sold shares of common stock).

professional plaintiff and a frequent-flying pension fund" who did not "share[] the retail investors' losses."[83] She also contends the requested incentive awards will "ma[k]e [Plaintiffs] (more than) whole in the Settlement," so they "could not represent Class members who would lose out."[84]

As the Special Master recommended, Izzo's complaints are not disqualifying. This Court has repeatedly determined that representative plaintiffs who hold small numbers of shares "are capable of vigorously prosecuting a case."[85] Delaware courts routinely appoint institutional stockholders as lead plaintiffs in representative actions, for good reason.[86] The mere fact that Plaintiffs traded differently than other

---

[83] Izzo Exc. at 35.

[84] *Id.* at 35 & n.113.

[85] *In re Ebix, Inc. S'holder Litig.*, 2018 WL 3570126, at *3 (Del. Ch. July 17, 2018) (ORDER) (collecting cases); *see also, e.g.*, *Van de Walle*, 1983 WL 8949, at *1, *6 (designating plaintiff who held 15 shares as class representative even though his "method of acquiring his shares of stock may leave something to be desired"); *Van de Walle v. Salomon Bros., Inc.*, 1997 WL 633288, at *2 (Del Ch. Oct. 2, 1997) (finding that a shareholder plaintiff with only 100 shares and $388 in potential losses could adequately represent the class); *Glosser v. Cellcor, Inc.*, 1995 WL 106527, at *3 (Del. Ch. Mar. 10, 1995) (appointing as class representative a shareholder with 200 shares); *Joseph v. Shell Oil Co.*, 1985 WL 21125, at *3 (Del. Ch. Feb. 8, 1985) (holding that "[w]ith 100 shares at risk [plaintiff] ha[d] sufficient interest in the litigation to ensure that he w[ould] zealously protect the rights of [other members of the class]").

[86] *E.g.*, *Ebix*, 2018 WL 3570126, at *1, *3, *5 (granting class certification and appointing class representatives, one of which was Desert States Employers & UFCW Union Pension Plan); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2013 WL 610143, at *1, *5–7 (Del. Ch. Feb. 13, 2013) (finding New Jersey Carpenters Pension Fund an adequate class representative and certifying the class); *In re Cox Radio, Inc. S'holders Litig*, 2010 WL 1806616, at *1, *8 (Del. Ch. May 6, 2010) (certifying a class with Coral Springs Police Pension Fund as one of the co-lead plaintiffs), *aff'd*, 9 A.3d 475 (Del. 2010); *cf.* David H.

members of the class does not make their interests in the shares they hold antagonistic to those of their fellow stockholders. Plaintiffs suffered the same type of harm proportionate to their common stock holdings as every other class member.[87] Izzo has not demonstrated that Plaintiffs' interests are not aligned with those of the class in remedying that harm. As to the incentive awards, those are designed to compensate representative plaintiffs for the work, hassle, and exposure that their role requires.[88] Incentive awards restore representative plaintiffs to the baseline position

Webber, *Private Policing of Mergers and Acquisitions: An Empirical Assessment of Institutional Lead Plaintiffs in Transactional Class and Derivative Actions*, 38 DEL. J. CORP. L. 907, 908 (2014) (presenting "evidence that public-pension funds, alone among institutional types, statistically significantly correlate with the outcomes of greatest interest to shareholders-both an increase in the offer price and lower attorneys' fees").

[87] *See AMC*, --- A.3d ---, 2023 WL 4677722, at *2 ("The factual predicate on which the plaintiffs' claims are based depicts the plight of the common stockholders who have been harmed by the issuance and voting power of the preferred units."); *id.* at *19 ("Plaintiffs have undertaken a fiduciary role only as to the claims asserted enforcing the common stock's rights on behalf of, and remedying the alleged harm suffered by, the class of common stockholders."); *Turner v. Bernstein*, 768 A.2d 24, 33 (Del. Ch. 2000) ("[T]he actions involve a challenge to a single course of conduct by the defendants that affects the stockholder class equally in proportion to their ownership interest in the enterprise."); *Rosen*, 1986 WL 4279, at *3 ("I conclude that plaintiffs are adequate representatives of the class of tendering stockholders and merged out stockholders. The unfair dealing, if any, affected both groups in substantially the same way and their interests do not appear to be antagonistic.").

[88] *See, e.g.*, *Raider v. Sunderland*, 2006 WL 75310, at *1 n.2 (Del. Ch. Jan. 4, 2006) (quoting *Ingram v. Coca-Cola Co.*[, 200 F.R.D. 685, 694 (N.D. Ga. 2001)] for the principle that "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation" (internal quotation marks omitted)); *In re Dell Techs. Inc. Class V S'holders Litig.*, --- A.3d ---, 2023 WL 4864861, at *38 n.38 (Del. Ch. July 31, 2023) (collecting cases awarding incentive awards to compensate representative plaintiffs for their efforts).

of their fellow stockholders. Izzo's exceptions as to Plaintiffs' adequacy are dismissed.[89]

Finally, the Court is satisfied that Plaintiffs' counsel are competent and qualified to prosecute this action. They have ample "experience[] in class and corporate litigation."[90] Without any substantiated argument to the contrary,[91] the Court finds the representative Plaintiffs to be adequate class representatives.

---

[89] Izzo has been open about her desire to take over this case as lead plaintiff should the Court reject the Proposed Settlement. *E.g.*, Izzo Obj. at 19; Izzo Exc. at 44; D.I. 583 ¶¶ 2, 5 (quoting *AMC*, --- A.3d ---, 2023 WL 4677722, at *13). This Court has considered an objector's desire to take over the class as context for their objection to a proposed settlement. *E.g.*, *Ryan v. Gifford*, 2009 WL 18143, at *12 (Del. Ch. Jan. 2, 2009).

[90] *MAT Five*, 980 A.2d at 401; *Ebix*, 2018 WL 3570126, at *3 (finding counsel "experienced of litigation of this type" to be competent for purposes of adequacy).

[91] Certain objectors challenge the competency of counsel based on the filing of the motion to lift the status quo order, or opposing certain class members' motions. *E.g.*, D.I. 450, Plaintiffs' Reply in Further Support of Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards [hereinafter "PRB"], Ex. 3, Form Objection, at 19–21; *see* D.I. 59; D.I. 69. Disagreeing with litigation strategy is insufficient to challenge competency of class counsel. *See, e.g.*, *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1997 WL 305829, at *20 (Del. Ch. May 30, 1997) ("This settlement process and result, although not perfect, is in my opinion an example of a fair and reasonable settlement achieved . . . with the assistance of experienced counsel. While reasonable minds might differ over any number of decisions (and I would) I conclude that the result as a whole is reasonable and the product of independent, informed action of directors acting in good faith. Therefore, I will approve the proposed settlement."); *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 105 F.R.D. 506, 509 (S.D. Ohio 1985) (finding class counsel competent in spite of the defendant's attacks on "the strategies of counsel for the named plaintiffs"); *N.J. Carpenters Health Fund v. Residential Cap.*, LLC, 272 F.R.D. 160, 164–65 (S.D.N.Y. 2011) (finding claims as to possible differences between class members on legal approach and settlement strategies to be "largely conjectural" and therefore not a basis for denying class certification).

25

### e) Court Of Chancery Rule 23 Affidavits

Rule 23(aa) requires the lead plaintiff to file an affidavit "stating that the person has not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party" aside from any damages or other compensation granted by the Court, or reimbursement of expenses by their lawyer; Rule 23(e) requires a second such affidavit.[92] Allegheny and Franchi filed their Rule 23(aa) affidavits on February 20, and their Rule 23(e) affidavits on May 4.[93]

### 2. Court Of Chancery Rule 23(b)

"Chancery Court Rule 23(b) divides class actions into three categories": subsection (1) "applies to class actions that are necessary to protect the party opposing the class or the members of the class from inconsistent adjudications in separate actions"; subsection (2) "applies to class actions for class-wide injunctive or declaratory relief"; and subsection (3) "applies when common questions of law or fact predominate and a class action would be superior to other means of adjudication."[94] "Class suits are not necessarily mutually exclusive; an action may

---

[92] Ct. Ch. R. 23(aa); Ct. Ch. R. 23(e).

[93] First Franchi Aff. ¶ 4; Second Franchi Aff. ¶ 7; Allegheny Verif. ¶ 6; Allegheny Aff. ¶ 8. Szymanski's affidavit filed February 20 affirms he and Allegheny complied with Rule 23.1(b). Allegheny Verif. ¶ 6. Rule 23.1(b) is analogous to Rule 23(aa), and I accept this representation as in accordance with Rule 23(aa).

[94] *Nottingham*, 564 A.2d at 1095 (footnotes, citations, and internal quotation marks omitted).

be certified under more than one subdivision of Rule 23(b) in appropriate circumstances."[95] "Delaware courts 'repeatedly have held that actions challenging the propriety of director conduct in carrying out corporate transactions are properly certifiable under both subdivisions (b)(1) and (b)(2).'"[96] So too here.

### a) Court of Chancery Rule 23(b)(1)

Certification under Rule 23(b)(1) is appropriate if: (i) prosecution of separate actions by individual class members would risk inconsistent and varying results that would impose inconsistent obligations, or (ii) adjudication with respect to one class member would be dispositive of the class's interests. "[A]ctions challenging the exercise of corporate fiduciary duties are frequently certified under this rule."[97] "The Court [has] held that the requirements of Rule 23(b)(1) are satisfied where the case involves 'one set of actions by defendants creating a uniform type of impact upon the class of stockholders.'"[98] In *Turner v. Bernstein*, the Court found class treatment appropriate under Rule 23(b)(1) given the "challenge to a single course of conduct by the defendants that affects the stockholder class equally in proportion to their ownership interest in the enterprise."[99]

---

[95] *In re Celera Corp. S'holder Litig.*, 59 A.3d 418, 432 (Del. 2012) (quoting *Krapf*, 584 A.2d at 1226).

[96] *Id.* at 432–33 (quoting *Cox Radio*, 2010 WL 1806616, at *8 (citations omitted)).

[97] *CME Grp.*, 2009 WL 1547510, at *5.

[98] *Buttonwood*, 2022 WL 2255258, at *11 (quoting *Turner*, 768 A.2d at 31).

[99] 768 A.2d at 33–34.

Here, the class satisfies Rule 23(b)(1). All class members are unaffiliated holders of common stock with rights to enforce fiduciary and statutory claims, challenging the same course of conduct by the defendants, namely: "creating and issuing Preferred Stock and APEs, entering into the Deposit Agreement with Computershare, and entering into the various agreements described [in the operative complaint] with Antara," and "permit[ing the APEs] to be voted in connection with the pending Proposals."[100] Plaintiffs also allege the class has suffered the same harm: economic and franchise dilution.[101]

### b) Court of Chancery Rule 23(b)(2)

Rule 23(b)(2) is satisfied if the defendants' conduct is "generally applicable to the class," making class-wide declaratory or injunctive relief appropriate.[102] "[C]ertification under Rule 23(b)(2) is appropriate when the rights and interests of

---

[100] *See AMC*, --- A.3d ---, 2023 WL 4677722, at *19 ("Plaintiffs are AMC common stockholders who purport to represent a class of common stockholders in pursuit of direct claims belonging to the common stockholders based on rights appurtenant to their shares of common stock." (footnote omitted)); *id.* at *21 ("The direct fiduciary and statutory claims Plaintiffs present are appurtenant to shares of common stock." (footnote omitted)); Op. Compl. ¶ 165 ("Moreover, as alleged above, by creating and issuing Preferred Stock and APEs, Defendants have caused and will continue to cause significant dilution and economic harm to the Class. Moreover, if the Certificate Proposals carry and the APEs convert into shares of Common Stock, the Class will suffer further economic harm and dilution."); Non-Op. Compl. ¶ 106 ("Plaintiff and the Class will be harmed if the Preferred Stock is not declared invalid and is permitted to be voted in connection with the pending Proposals.").

[101] *See, e.g.*, Op. Compl. ¶¶ 4, 32, 93, 110, 151, 165.

[102] Ct. Ch. R. 23(b)(2).

the class members are homogeneous."[103]  "Certification pursuant to Rule 23(b)(2) is warranted where the action concerns the alleged breaches of fiduciary duty by corporate directors affecting the stockholder class as a whole and the particular facts pertaining to any individual class member will not have any bearing on the appropriate remedy."[104]  This Court may certify a class under Rule 23(b)(2), even though the remedy may be a monetary or a monetary equivalent settlement, if the "action was commenced with a focus on injunctive or other equitable relief."[105]

Here, the class also satisfies Rule 23(b)(2).  Plaintiffs brought a breach of fiduciary duty claim alleging the defendants' breach harmed the class as a whole.[106] And "[a]lthough the remedy achieved" in the settlement is stock consideration, "this action was commenced with a firm focus on injunctive relief."[107]

### 3. Discretionary Opt-Out

"If a class is certified under Rule 23(b)(3), class members have an unqualified right to opt out of the class.  There is no corresponding *mandatory* opt-out right for

---

[103] *Celera*, 59 A.3d at 433 (citing *Nottingham*, 564 A.2d at 1095).

[104] *Ebix*, 2018 WL 3570126, at *4 (citing Ct. Ch. R. 23(b)(2), and *In re Resorts Int'l S'holders Litig.*, 570 A.2d 259, 269–70 (Del. 1990), and *Nottingham*, 564 A.2d at 1096–97)).

[105] *CME Grp.*, 2009 WL 1547510, at *5.

[106] *E.g.*, Op. Compl. ¶¶ 162–167.

[107] *CME Grp.*, 2009 WL 1547510, at *5.

classes certified under Rule 23(b)(1) or (b)(2)."[108]  The Delaware Supreme Court "ha[s] recognized that circumstances may arise where discretionary opt-out rights should be granted, such as where the class representative does not adequately represent the interests of particular class members, triggering due process concerns."[109]  "Occasions where courts have granted discretionary opt-out rights include:  when the claims of an objector seeking to opt out are sufficiently distinct from the claims of the class as a whole and an opt out is appropriate to facilitate the fair and efficient conduct of the action."[110]  But "[t]he propriety of a director action should be adjudicated, if it is to be adjudicated, once with respect to all similarly situated shareholders."[111]  In such a situation, no opt-out right is warranted.[112]

As the Special Master observed in her Report, "numerous Objectors have asked to opt out of the Settlement, with many not saying much more in the Objection."[113]  The Report recommended the Court not afford discretionary opt-out

---

[108] *Celera*, 59 A.3d at 432 (emphasis added) (citing Ch. Ct. R. 23(c)(2), and *Nottingham*, 564 A.2d at 1097–98)).

[109] *Celera*, 59 A.3d at 435 (citing *Prezant*, 636 A.2d at 924)).

[110] *Id.* at 435 (footnote omitted).

[111] *In re Mobile Commc'ns Corp. of Am., Inc., Consol. Litig.*, 1991 WL 1392, at *16 (Del. Ch. Jan. 7, 1991).

[112] *Id.* ("The Constitution does not require (*cf. Hansberry v. Lee*, 311 U.S. 32 (1940)), nor do prudential considerations, in my opinion, commend the granting of an opt-out right in stockholder actions attacking the propriety of director conduct in connection with a corporate merger.").

[113] Rpt. at 71 (footnote omitted).

rights to this class because of the nature of the relief sought and the consideration received.[114] The Report also noted, "Objectors have not cited any controlling law or provided any persuasive reason to permit opt outs."[115]

Three putative stockholders directly or indirectly took exception to this recommendation.[116] Izzo first accuses the Special Master of "misunderstanding" her Objection.[117] She asserts that absent an opt-out, the Proposed Settlement violates the class's due process rights, and cites *In re Celera Corp.* to argue that "a settlement cannot 'deny a discretionary opt-out right where the policy favoring global settlement [is] outweighed by due process concerns.'"[118] *Celera* is inapposite: there, "the class representative was 'barely' adequate, the objector was a significant shareholder prepared independently to prosecute a clearly identified and supportable claim for substantial money damages, and the only claims realistically being settled at the time of the certification hearing nearly a year after the merger were for money damages" where the action began with claims for injunctive relief that settled

---

[114] *Id.* at 71–73.

[115] *Id.* at 71; *id.* at 72 n.234 ("Izzo concludes footnote 125 [of her Objection] by noting her belief that permitting opt outs is the better course. [N]either Izzo nor any other Objector has proposed a legitimate litigation path forward after the Conversion.").

[116] Izzo Exc. at 35–38; *see also* D.I. 558 at 21 (requesting the Court let him opt out, but not engaging with the Special Master's recommendation against an opt-out class); D.I. 552 at 8–10 (focusing on sub-classes).

[117] Izzo Exc. at 35.

[118] *Id.* at 36 (quoting *Celera*, 59 A.3d at 436).

without formal court approval.[119] Izzo's due process argument also relies on *Prezant* to assert stockholders must be able to opt out to pursue an injunction against the Conversion,[120] which Plaintiffs permit under the Proposed Settlement. As explained above, Izzo misinterprets *Prezant*. Izzo's doctrinal exceptions are dismissed.

More broadly, an opt-out right is not feasible. First, the Notice did not provide for such opt-out procedures; nor was it required to do so. An opt-out class would require another notice with a higher distribution rate before class members could opt out. Second, for an opt-out right to be meaningful, class members who wanted to opt out would have to accurately follow the noticed procedures; stockholder procedural compliance has been a challenge in this case.[121] And third, permitting an opt-out right would further delay the effective date, which as this opinion explains would be detrimental to AMC and the class's interests in it.

More fundamentally, as discussed in the Rule 23(b) analysis above, the claims and the relief sought are class-wide. If Plaintiffs had prevailed and the Court granted

---

[119] *Celera*, 59 A.3d at 436 (footnote omitted).

[120] Izzo Exc. at 36.

[121] *E.g.*, D.I. 567, Appendix B (listing 354 "Timely Objections Without Proof of Ownership"); Rpt. at Appendix C (listing 170 "Untimely Objections"); *id.* at Appendix E (listing 37 "Information Statements"); *id.* at Appendix F (listing 2,108 "Inquiries"); PRB at 8 ("Of the approximately 2,850 purported objectors, almost half—about 1,235—did not include *any* information regarding their holdings. Of objectors including *some* evidence of beneficial ownership (*e.g.*, a brokerage account statement, a screen shot, or an authorized statement from a broker), the vast majority did not comply with applicable requirements."); *id.* at 8 n.9 ("For example, brokerage account screenshots frequently did not include the stockholder's name and/or date(s) of holdings.").

injunctive relief, the entire class would have benefitted from that relief. The Proposed Settlement releases those claims and allows the Reverse Split and the Conversion to go forward with stock consideration to each member of the class. It is impossible to split that bargain by permitting the Reverse Split and the Conversion to go forward, while excluding certain class members from the consideration and permitting them to maintain their claims against, and requests to enjoin, the Reverse Split and the Conversion.[122] I decline to certify a discretionary opt-out class. The other exceptions on this point are dismissed.

### C. Adequacy Of Notice

Rule 23 requires that notice of a proposed settlement be given to stockholders. The Court evaluates both the contents of the notice, and its delivery.

#### 1. The Notice's Contents Were Sufficient.

"An adequate notice describes the settlement, 'puts stockholders upon notice as to the general nature of the subject matter, and warns them that their substantial

---

[122] *See Phila. Stock Exch.*, 945 A.2d at 1136–37 ("The Objectors argue that their procedural due process rights were violated because: (i) they were not afforded a right to opt out of the class . . . . The Objectors' procedural due process argument would have merit if this were a class action primarily 'for money damages or other relief at law' under Rule 23(b)(3). Here, however, the primary relief sought in the initial and amended complaints was equitable . . . . The relief afforded in the settlement is also primarily equitable . . . . In these circumstances, it cannot be fairly argued that the trial court's declination to grant an opt-out right to the class was unconstitutional." (footnote omitted)).

interests are involved.'"[123]  "A notice of settlement is sufficient if it 'contains a description of the lawsuit, the consideration for the settlement, the location and time of the settlement hearing, and informs class members that additional information can be obtained by contacting class counsel.'"[124]  "A notice is 'not required to eliminate all occasion for initiative and diligence on the part of the stockholders.'"[125]

Together, the Stipulation and the Notice describe the underlying facts related to the litigation, the claims Plaintiffs pled, the procedural history of the action, and the Proposed Settlement.  The Notice also adequately describes the consideration for the settlement:  it states the Proposed Settlement contemplates consideration of one share of common stock for every seven and a half shares of common stock owned by class members at the Settlement Class Time.[126]  The Notice provides the location and time of the Settlement Hearing.[127]  Finally, the Notice informs stockholders who to contact for further information:  it discloses the contact information of the Register in Chancery and Plaintiffs' counsel.[128]  I conclude the contents of the Notice are adequate.

---

[123] *Activision*, 124 A.3d at 1061 (quoting *Geller v. Tabas*, 462 A.2d 1078, 1080 (Del. 1983)).

[124] *Id.* (quoting *Phila. Stock Exch.*, 945 A.2d at 1135 n.13).

[125] *Id.* (quoting *Braun v. Fleming–Hall Tobacco Co.*, 92 A.2d 302, 309 (Del. 1952)).

[126] Notice at 1–2; *id.* ¶¶ 3, 26–27, 44–45.

[127] *Id.* at 3; *id.* ¶ 60.

[128] *Id.* ¶¶ 71–74.

## 2. Notice Was Adequately Distributed.

The Notice was also adequately distributed. Notice is to be delivered in such a manner as the Court directs: by mail, publication or otherwise.[129] "Unlike certification under Rule 23(b)(3)—which requires 'that class members be given actual notice . . .'—notice to absent class members . . . [is] at the Court's discretion for a class certified under Rule 23(b)(2)."[130]

Notice is adequately delivered if it is sent to record holders.[131] Under well-settled Delaware law, non-record holders assume the risk that they may not receive notice from their nominee or custodian.[132] "There is no requirement to mail

[129] *See* Ct. Ch. R. 23(e).

[130] *In re Lawson Software, Inc.*, 2011 WL 2185613, at *1 (Del. Ch. May 27, 2011) (quoting *Nottingham*, 564 A.2d at 1097–98, and citing Ct. Ch. R. 23(d)(2), and *MAT Five*, 980 A.2d at 401).

[131] *Activision*, 124 A.3d at 1061 ("In my view, the scheduling order could have required mailing only to a single list of record holders as of the date of mailing. Notice need only be sent to record holders." (citing *Am. Hardware Corp. v. Savage Arms Corp.*, 136 A.2d 690, 692 (Del. 1957))).

[132] *See In re Dole Food Co., Inc.*, 2017 WL 624843, at *5 (Del. Ch. Feb. 15, 2017) (interpreting *Activision* to hold that "for a notice of settlement [to] be legally sufficient, a corporation only need mail it to its record holders"); *Am. Hardware*, 136 A.2d at 692 ("If an owner of stock chooses to register his shares in the name of a nominee, he takes the risks attendant upon such an arrangement, including the risk that he may not receive notice of corporate proceedings."); *Enstar Corp. v. Senouf*, 535 A.2d 1351, 1354–55 (Del. 1987) (same); *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 394 (Del. 2010) (same); *In re Madison Square Garden Ent. Corp. S'holders Litig.*, 2023 WL 3696664, at *1 (Del. Ch. May 26, 2023) (same); *Activision*, 124 A.3d at 1061 (same); *In re Protection One, Inc. S'holder Litig.*, C.A. No. 5468-VCS, D.I. 89 at 63 (Del. Ch. Oct. 6, 2010) (TRANSCRIPT) ("You are allowed to base a settlement on record holders. That is what we look at. When you deal -- when you are a beneficial owner and you deal with a broker, you are at your own risk. If you want to get notice of a settlement, you become a record holder.").

35

a settlement notice to every single class member who ever owned a share of a publicly held company."[133]  The Scheduling Order required AMC to deliver "the best notice practicable under the circumstances."[134]

Here, notice was adequate under the unique circumstances of this case.  AMC has millions of human beneficial stockholders all over the world.  AMC's retail base has a reputation for their online activity.[135]  But many of AMC's human stockholders presumably do not monitor their AMC investment online.  And the parties sought notice on a compressed timeline designed to permit AMC to access vital capital if the settlement was approved.[136]

The Company distributed notice electronically and by publication:  on AMC's investor relations website, on AMC's Twitter account, via a Form 8-K, over *PR Newswire*, and on Depository Trust Company's Legal Notice System.[137]  In most

---

[133] *Activision*, 124 A.3d at 1060 (citation omitted).

[134] *See* D.I. 185, Scheduling Order, ¶ 11.

[135] *E.g.*, D.I. 206, Plaintiffs' Opening Brief in Support of Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards [hereinafter "POB"], at 11.

[136] D.I. 217 at 18 ("And so I guess the question I'm asking is:  Can we truncate it a little bit?  And obviously we need to work backwards from a hearing date.  But from the perspective of capital raising, once we get into the late summer, that is typically a quiet period.  So I'm a little worried about this dragging -- a little -- fairly worried about this dragging into the fall."); *id.* at 19 ("I do agree with Mr. Neuwirth, there was a desire on the company's part for reasons that, frankly, we are sympathetic to, to be able to do a fundraising before the markets basically shut down in August.").

[137] D.I. 530, Affidavit of Publication of Notice for Joshua S. Amsel [hereinafter "Amsel Aff."],  ¶  2;  Presentations,  AMC  Theatres  Investor  Relations,

36

instances, for publicly traded companies with a higher percentage of institutional stockholders, this is enough.[138] In addition, in this high-profile case, these electronic disclosures were amplified in the press and on social media.[139]

https://investor.amctheatres.com/financial-performance/presentations/default.aspx (last visited Aug. 9, 2023); Amsel Aff. ¶ 3; @AMCTheatres, TWITTER (May 6, 2023 10:37 PM), https://twitter.com/amctheatres/status/1655039034798874626?s=46&t=WpxdAi8Gn-KvX2ChMS18bQ; D.I. 531 at Exhibits A - C to Affidavit of Publication of Notice for Joshua S. Amsel [hereinafter "Amsel Aff., Ex."], at Ex. A (same); Amsel Aff. ¶ 4; Amsel Aff, Ex. B; AMC Entertainment Holdings, Inc., Current Report (Form 8-K) (May 8, 2023); *see Activision*, 124 A.3d at 1061 ("The filing of a copy of the notice as an exhibit to a Form 8–K provided an additional means for beneficial owners to receive notice."); Amsel Aff. ¶ 5; *Summary Notice of Pendency of Stockholder Class Action and Proposed Settlement, Settlement Hearing, and Right to Appear*, PR NEWSWIRE (May 8, 2023 4:58 PM) https://www.prnewswire.com/news-releases/summary-notice-of-pendency-of-stockholder-class-action-and-proposed-settlement-settlement-hearing-and-right-to-appear-301818710.html; Amsel Aff., Ex. C (same); Mulholland Aff. ¶ 6.

[138] *See, e.g.*, *Madison Square Garden*, 2023 WL 3696664, at *2.

[139] *E.g.*, Amsel Aff. ¶ 3; @AMCTheatres, TWITTER (May 6, 2023 10:37 PM), https://twitter.com/amctheatres/status/1655039034798874626?s=46&t=WpxdAi8Gn-KvX2ChMS18bQ; Amsel Aff., Ex. A (same); Mike Murphy, *AMC says it's reached deal to settle shareholder lawsuit over APE conversion*, MARKETWATCH (May 8, 2023 7:39 AM), https://www.marketwatch.com/story/amc-says-its-reached-deal-to-settle-shareholder-lawsuit-over-ape-conversion-4627a08c (last visited Aug. 9, 2023); Jayson Aycock, *AMC Entertainment filing sets up end of June to resolve APE conversion lawsuit*, SEEKING ALPHA (May 8, 2023 5:30 PM), https://seekingalpha.com/news/3967626-amc-entertainment-filing-sets-up-end-of-june-to-resolve-ape-conversion-lawsuit (last visited Aug. 9, 2023) ("AMC Entertainment (NYSE:AMC) formally filed its notice to stockholders about its settlement to resolve class action litigation, linked to the company's plan to raise equity by converting preferred units and implementing a reverse stock split. The company's notice, filed with the SEC, locks down timelines and procedures for AMC shareholders to formally object or support a settlement of the action, and sets up a next catalyst by way of a June 29–30 hearing at the Delaware Court of Chancery."); *AMC: Now We Can AMC Some of WTF is Going On*, THE CHANCERY DAILY (May 18, 2023), https://thechancerydaily.substack.com/p/amc-now-we-can-amc-some-of-wtf-is (last visited Aug. 9, 2023) ("The AMC settlement was noticed to stockholders at the beginning of May after a bit of a bumpy start."); *cf.* Allison Frankel, *AMC meme investors win rare*

To reach human stockholders who may not be monitoring their investment or financial or legal news online, the Court also directed the Company to promptly cause postcard notices to be mailed. At AMC's direction, notice administrator Strategic Claims Services ("SCS") "mailed . . . post card notice to 16,382 record holders identified in transfer records that were provided to SCS on May 1, 2023 by Weil, Gotshal & Manges LLP, counsel to AMC."[140] "The mailing of the post card to record holders of AMC Common Stock was completed on May 8, 2023."[141] SCS also "mailed or emailed approximately 2.8 million post card notices to beneficial holders of AMC Common Stock."[142] This is the majority of the 3.8 million stockholders the defendants' counsel represented owned common stock.[143]

Postcard notice was far from perfect. The notice administrator failed to mail, or facilitate mailing of, notice to approximately a million beneficial owners.[144] One

*access to evidence in fight over $129 mln settlement*, REUTERS (May 22, 2023 6:14 PM), https://www.reuters.com/legal/government/amc-meme-investors-win-rare-access-evidence-fight-over-129-mln-settlement-2023-05-22/ (last visited Aug. 9, 2023).

[140] Mulholland Aff. ¶ 4.

[141] *Id.* ¶ 4.

[142] *Id.* ¶ 7; Bravata Aff. ¶ 4.

[143] D.I. 217 at 32 ("By our estimation, the number of beneficial stockholders is approximately 3.8 million. Obviously, this is a stock that's held very widely."); *id.* at 35 ("[W]e've got almost 4 million stockholders that we would have to mail to . . . ."); *see also* PRB at 8, 37, 51 (referencing AMC's estimated 3.8 million stockholders).

[144] *Compare supra* note 143 (representing to the Court that there were approximately 3.8 million AMC common stockholders), *with* Mulholland Aff. ¶ 7 ("Prior to May 31, 2023, SCS and nominees for beneficial holders of AMC Common Stock mailed or emailed

broker was significantly delayed in mailing postcards to another 1.5 million beneficial holders.[145] The postcard sent recipients to a nonfunctioning URL that did not direct to the correct website.[146] Future settling parties should not use this case

approximately 2.8 million post card notices to beneficial holders of AMC Common Stock."); Bravata Aff. ¶ 4 ("As of June 22, 2023, SCS and nominees for beneficial holders of AMC Common Stock mailed or emailed approximately three million post card notices to beneficial holders of AMC Common Stock."); *see also* D.I. 553 ¶ 6 (noting the 1 million discrepancy between 3.8 million stockholders and 2.8 million postcards); D.I. 554 ¶ 1 (same); D.I. 560 at 1–2 (same). *But compare* D.I. 565 at 4 ("I am a Canadian and I did not receive a postcard to date. I messaged Interactive Brokers Canada and they messaged back that they do not mail out postcards. They sent me a link to the court case." (emphasis omitted)), *with* Mulholland Aff., Ex. C (listing Interactive Brokers Canada Inc. as a nominee to which SCS mailed a notice letter requesting assistance identifying AMC stockholders and beneficial holders), *and* Mulholland Aff., Ex. D (listing brokers who responded to SCS with beneficial holders' contact information so that SCS could mail the postcards, or an indication that the broker would mail the postcards to the beneficial holders, or a response that there were "no holders;" not identifying Interactive Brokers Canada Inc. as having responded to SCS); Bravata Aff., Ex. A (same).

[145] *Compare* Mulholland Aff., Ex. D (reflecting that Robinhood has the names and addresses of 1,560,828 beneficial holders), *and* Bravata Aff., Ex. A (same), *and* Mulholland Aff., at Ex. E (reflecting SCS mailed Robinhood letters on May 3 and May 16, emailed Robinhood on May 16, 17, and 18, and called Robinhood on May 17), *and* Bravata Aff., Ex. B (same), *with* D.I. 175 at 5 (writing the parties that the schedule that was ultimately reflected in the Scheduling Order "depends on prompt initiation of postcard notice, and will only work if postcards will generally be delivered by May 24, 2023"); *see also* Izzo Exc. at 6–7.

[146] *Compare* Mulholland Aff., Ex. A ("You can file a written statement in support of, or objection to, the Settlement that is required to be received no later than May 31, 2023, in accordance with the instructions set forth in the Notice and the letter that the Court published to AMC stockholders, which will be posted on the "Investor Relations" section of AMC's website, investor.amctheatres.com/newsroom/default.aspx"), *with* Presentations, AMC THEATRES INVESTOR RELATIONS, https://investor.amctheatres.com/financial-performance/presentations/default.aspx (last visited Aug. 9, 2023) (the website where AMC posted relevant documents); *accord* D.I. 554 ¶ 1 ("For those who received the postcard after [May 24th], mostly around May 31st, the contents were highly confusing, difficult to locate, and intentionally misleading. The postcard directed shareholders AMC Theaters' generic 'newsroom' page on the [investor

as a model for distributing postcard notice.

Still, on the unique facts of this case, I conclude notice was adequate. Electronic notice was comprehensive. The postcards were intended to provide supplemental notice to retail owners who might miss the comprehensive electronic notice. Record holders received their postcards in time; beneficial owners are not entitled to actual notice. That some postcards were not timely delivered to beneficial owners does not mean that notice overall was so inadequate as to deny, or require renoticing of, the settlement. And while the URL in the postcard was inaccurate, the postcard gave notice of the fact of the Proposed Settlement; a quick internet search would lead stockholders to the pervasive electronic notice of the Proposed Settlement.[147]

The stockholder response to the Proposed Settlement is evidence that notice was adequate. Many of the putative stockholder Objections, and exceptions, complained that stockholders had not received a postcard notice.[148] These

---

relations] website instead of 'financial-performance/presentations' and several lead counsel websites, rather than providing a clear landing page and clear email address . . . as requested.").

[147] *Activision*, 124 A.3d at 1061 (quoting *Braun*, 92 A.2d at 309).

[148] Rpt. at 76; *see also* D.I. 553 ¶ 6; D.I. 554 ¶ 1; Izzo Exc. at 7–8; D.I. 565 at 4; D.I. 506 at 1; D.I. 603, Ex. A ¶¶ 1–2.

One stockholder, Anthony Kramer, asserted on June 20 that he had not received the postcard notice or any notice of the Proposed Settlement and the May 31 Objection deadline until June 2. D.I. 506 at 1. He did not submit an affidavit to this effect until July 31, over a month after the record had closed. D.I. 603, Ex. A ¶¶ 1–3. In any event, Kramer

40

Objections actually demonstrate that those stockholders had notice of the Proposed Settlement, and of where, when, and how to submit an Objection to the Proposed Settlement.

The notice afforded due process. The stockholder communications to Plaintiffs' counsel and the Court, unprecedented in their scale, were variations on a set of themes. The Special Master and I have considered those themes. At the risk of minimizing the concern, ingenuity, and savvy of those who did not receive timely actual notice and who would have otherwise objected, the scale of the stockholder response makes it unlikely that additional actual postcard notice would have presented a dispositive issue with the Proposed Settlement that was not already identified by the Court, the parties, or any of the thousands of stockholders who weighed in, including Izzo and her counsel.

For the foregoing reasons, notice was adequate and the exceptions to the Special Master's conclusion that notice was adequate are dismissed.

### D.    The Settlement Is Reasonable.

I now turn to consider whether the terms of the Proposed Settlement are reasonable, recognizing that "[t]his Court generally favors settlement of complicated

---

effectively joined Izzo's Objection and identifies no manner in which his interests were not protected. D.I. 506 (filing a "Joinder of Anthony Kramer in Rose Izzo's Objection to the Proposed Settlement, Award of Attorneys' Fees and Expenses, and Incentive Awards").

litigation."[149]  The Court undertakes this task to protect the interests of the absent class members vis-a-vis the personal interests of the representative plaintiff and the plaintiff's counsel.  Care must be taken in approving a class action settlement company to ensure the fiduciary nature of the action is respected, and that approval is consistent with due process; the Court is to guard against the risk that "absent class members and others with a stake in the litigation could have their claims released without an opportunity to be heard."[150]

The Court's role is to act as a fiduciary, applying a range-of-reasonableness review that is one step removed from the litigant's business judgment to accept the settlement.[151]  This Court put it simply in *Kahn v. Sullivan*:  "the Court's role in reviewing the proposed Settlement . . . is quite restricted."[152]  The Delaware Supreme Court went on in that case to explain the Court was to "balance the policy preference for settlement against the need to insure that the interests of the shareholders, as a class, had been fairly represented."[153]  In sum:  the role of judicial review is not to second-guess or optimize every element of the settlement; rather, the Court's role as

---

[149] *Gatz*, 2009 WL 1743760, at *2.

[150] *Celera*, 59 A.3d at 433–34 (quoting Edward P. Welch et al., *Mergers & Acquisitions Deal Litigation Under Delaware Corporation Law* § 11.01 (2012)).

[151] *Activision*, 124 A.3d at 1064 (quoting *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2013 WL 458373, at *2 (Del. Ch. Feb. 6, 2013)).

[152] 594 A.2d 48, 58 n.23 (Del. 1991).

[153] *Id.* at 63 (citing *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del. 989)).

42

a fiduciary is to ensure due process is afforded, and to weigh the "give" against the "get" to ensure the class is reaping a reasonable benefit alongside the representative plaintiff.

In so doing, the Court's function is "to consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and to apply its own business judgment in deciding whether the settlement is reasonable in light of those factors."[154] The Court must then "determine whether the settlement falls within a range of results that a reasonable party in the position of the plaintiff, not under any compulsion to settle and with the benefit of the information then available, reasonably could accept."[155] "[T]he Court of Chancery need not limit itself to an examination of the immediate tangible results to [the class] a corporation or its shareholders in determining the fairness of a settlement agreement. The probable long-term benefits of the settlement are also properly considered."[156] Courts have framed this reasonableness review as evaluating the "give" and the "get"

---

[154] *Phila. Stock Exch.*, 945 A.2d at 1137 (quoting *Polk*, 507 A.2d at 535, and citing *Barkan*, 567 A.2d at 1284–85).

[155] *Activision*, 124 A.3d at 1064 (quoting *Forsythe*, 2013 WL 458373, at *2).

[156] *Infinity Broad.*, 802 A.2d at 290 (footnotes omitted) (citing *Prince v. Bensinger*, 244 A.2d 89, 95 (Del. Ch. 1968)).

of the proposed settlement:  the settlement class releases, or "gives" up, claims and, in exchange, "gets" consideration.[157]

The Stipulation of Settlement, as amended, includes the following release (the "Release"):

> "Released Plaintiffs' Claims" means any and all actions, causes of action, suits, liabilities, claims, rights of action, debts, sums of money, covenants, contracts, controversies, agreements, promises, damages, contributions, indemnities, and demands of every nature and description, whether or not currently asserted, whether known claims or Unknown Claims, suspected, existing, or discoverable, whether arising under federal, state, common, or foreign law, and whether based on contract, tort, statute, law, equity, or otherwise (including, but not limited to, federal and state securities laws), that Plaintiffs or any other Settlement Class Member: (i) asserted in the *Allegheny* Complaint or the *Munoz* Complaint; or (ii) ever had, now have, or hereafter can, shall, or may have, directly, representatively, derivatively, or in any other capacity that, in full or part, concern, relate to, arise out of, or are in any way connected to or based upon the allegations, transactions, facts, matters, occurrences, representations, or omissions involved, set forth, or referred to in the Complaints and that relate to the ownership of Common Stock during the Class Period, except claims with regard to enforcement of the Settlement and this Stipulation.[158]

As consideration for the Release, AMC agreed to issue 6,922,565 shares of

---

[157] *See Phila. Stock Exch.*, 945 A.2d at 1148 n.54 (discussing how the court must "assure" the "class members will receive fair consideration for their release of th[eir] claims"); *Trulia*, 129 A.3d at 891 ("In doing so, the Court evaluates not only the claim, possible defenses, and obstacles to its successful prosecution, but also 'the reasonableness of the "give" and the "get,"' or what the class members receive in exchange for ending the litigation." (footnotes omitted)).

[158] D.I. 582 at Addendum to Stipulation and Agreement of Compromise, Settlement, and Release ¶ 1.

common stock (the "Settlement Shares") to the class members.[159]  Because there is no monetary payment to the Company, the Proposed Settlement does not increase the size of AMC's equity pie, but rather gives class members a slightly bigger slice at the expense of APE unitholders.  This is the "get."

### 1. The Class's "Give"

In exchange for the "get," the class is releasing certain claims it has against the defendants.  This is the "give."  In analyzing the class's "give," the Court examines the strength of the claims and possible claims released in the settlement.[160]  Put another way, the Court considers the scope of the release and the value of the released claims, taking into account the likelihood a plaintiff could prevail and the benefits (monetary or otherwise) of that victory.

In conducting this analysis, I will assess the value of the claims as noticed, pled, and released.  I make this unremarkable statement because Plaintiffs have handled their claims in unusual and inconsistent ways.  The Release includes claims asserted in both the operative complaint (referred to as the "Munoz Complaint," after Franchi's former co-plaintiff) and the Allegheny complaint, as well as claims that

---

[159] POB at 31.

[160] *Caremark*, 698 A.2d at 961 ("A motion [to approve a proposed settlement] requires the court to assess the strengths and weaknesses of the claims asserted in light of the discovery record and to evaluate the fairness and adequacy of the consideration offered to the corporation in exchange for the release of all claims made or arising from the facts alleged.").

are connected to or based upon the allegations in both complaints.[161] The released

claims include the Section 242 claim the Allegheny complaint asserted against

AMC.

The Release also includes the breach of fiduciary duty claim as pled.

Plaintiffs' briefing in support of the Proposed Settlement truncated that claim to

exclude consideration of events before December 2022.[162] The settlement

[161] Allegheny brought a Section 242(b) claim; Franchi did not. *See* Op. Compl.; Non-Op. Compl. ¶¶ 100–107. Plaintiffs designated Franchi's complaint as the operative complaint, but informed the Court in a March 13 letter that "the claim articulated in Count II of the Complaint filed in *Allegheny County Employees' Retirement System v. AMC Entertainment Holdings, Inc., et al.*, C.A. No. 2023-0215-MTZ (the '*Allegheny* Action') **will** be included as a basis for Plaintiffs' motion for a preliminary injunction in this consolidated action." D.I. 34 at 1–2 (emphasis in original); D.I. 20 ¶ 7 (designating the Franchi complaint the operative complaint). At argument, Plaintiffs' counsel indicated they might not have sought an injunction claim based on the Section 242 claim after all. Hr'g Tr. 52 ("I think that you may -- Your Honor may or may not have even seen briefing on the Section 242 claim at the injunction stage. It was there, and there was a letter that says we're pursuing it or have the option to pursue it. And ultimately, I -- I can't predict what would have happened if an injunction brief was filed. But I think I can say there was no guarantee there was going to be a statutory argument under 242."). At the end of the day, the Section 242 claim is being released, so I must evaluate it in the "give" as against the "get."

Plaintiffs also contend that "Franchi did not allege that the issuance of the APEs was 'a wrong,' nor did he assert a §242(b) claim." PRB at 43. Franchi is a lead plaintiff for all claims in this litigation and has negotiated a release for both the breach of fiduciary duty claim he pled, and the Section 242(b) claim Allegheny pled.

[162] POB at 39 ("[A]ny claim concerning APEs did not arise until Defendants weaponized them alongside the [December 2022] Antara Transaction."); *accord id.* at 6 ("Plaintiffs' core claim, concerning the Board inequitably overriding the Common Stock franchise through the Antara Transaction, would be governed by the *Blasius* doctrine."); *id.* at 7 ("In assessing Plaintiffs' injunction application, the Court would examine the December 2022 timeframe to assess the merits of Plaintiffs' claims."); PRB at 1 ("Plaintiffs' *Blasius* claim is *prima facie* viable, as Defendants' 'primary purpose' for the Antara Transaction was to override Common Stock opposition to increasing the number of authorized AMC shares.").

documents make plain that the class is releasing the claim as pled.[163] I must evaluate the Proposed Settlement based on the claims as pled, not as briefed.[164]

In the operative complaint, Plaintiffs alleged:

Defendants breached their fiduciary duties by creating and issuing Preferred Stock and APEs, entering into the Deposit Agreement with Computershare, and entering into the various agreements described herein with Antara, all of which are coercive, will sway the outcome of the . . . Proposals, and are designed to circumvent the franchise rights of the Class. The Board's actions are plainly intended to push through the . . . Proposals notwithstanding the previous, repeated opposition of the Class.

---

[163] The Notice described the operative complaint as "asserting a claim for breach of fiduciary duty in connection with the Proposals and seeking injunctive relief prior to the effectuation of the Proposals." Notice ¶ 14. The Stipulation and Notice define a proposed "Settlement Class" to mean "all holders of AMC Common Stock between August 3, 2022, through and including the Settlement Class Time," or record time, "after the Reverse Stock Split is effected, but before the Conversion." *Id.* ¶ 29; *id.* ¶ 64(v); *see also* Stip. ¶ A.1(d) ("'Class Period' means the period from August 3, 2022 through and including the Settlement Class Time."); *id.* ¶ 1(w) ("'Settlement Class' means a non-opt-out class for settlement purposes only, and pursuant to Court of Chancery Rules 23(a), 23(b)(1), and 23(b)(2), consisting of all holders of Common Stock during the Class Period . . . ."); D.I. 537 at 4 ("The Settlement Class includes all stockholders who held at any time between August 3, 2022 through and including the Class Settlement Time."); D.I. 537 at 4 (clarifying that the definition of Settlement Class "includes all stockholders who held [or purchased] at any time between August 3, 2022 through and including the Settlement Class Time," as long as they continued to hold at the Settlement Class Time).

[164] *Parseghian ex rel. Gregory J. Parseghian Revocable Tr. v. Frequency Therapeutics, Inc.*, 2022 WL 2208899, at *9 (Del. Ch. June 21, 2022) ("A Court must examine what has been alleged in the pleadings, not what a plaintiff believes has been alleged." (quoting *Gabelli & Co., Inc. v. Liggett Grp., Inc.*, 1983 WL 18015, at *3 (Del. Ch. Mar. 2, 1983), *aff'd*, 479 A.2d 276 (Del. 1984))); *id.* at *8 n.75 ("Plaintiffs cannot amend their Complaint through their brief." (citing *Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002))).

> Moreover, as alleged above, by creating and issuing Preferred Stock and APEs, Defendants have caused and will continue to cause significant dilution and economic harm to the Class. Moreover, if the . . . Proposals carry and the APEs convert into shares of Common Stock, the Class will suffer further economic harm and dilution.[165]

The defendants created and first issued the APEs in July and August 2022, respectively.[166] They entered the Deposit Agreement with Computershare in August 2022, and the Antara Transaction in December 2022.[167] AMC disclosed in December 2022 that it would hold a vote on the Proposals.[168] In considering the value of Plaintiffs' fiduciary duty claim, I interpret it to include the alleged conduct between July and December 2022.

### a) The Scope Of The Release

The July 21 Opinion focused on one unsound provision in the Release, and concluded the class of common stockholders, as represented by common stockholders bringing claims affecting common stockholder rights, could not release claims appurtenant to APE units, and that the release of such claims was not

---

[165] Op. Compl. ¶¶ 164–165 (formatting modified).

[166] POB, Ex. 11 at AMC_00005304; DOB, Ex. O, AMC Entertainment Holdings, Inc., Registration Statement (Form 8-A) (Aug. 4, 2022) [hereinafter "Aug. 4, 2022 Form 8-A"].

[167] DOB, Ex. N, AMC Entertainment Holdings, Inc., Current Report (Form 8K/A) (Aug. 4, 2022), Ex. 4.1 [hereinafter "Deposit Agr."], at Recitals (defining "Depositary" as Computershare, Inc. and its affiliate, Computershare Trust Company, N.A.); POB, Ex. 13 [hereinafter "Dec. 21, 2022 Board Minutes"], at AMC_00005968–70; DOB, Ex. R., AMC Entertainment Holdings, Inc., Current Report (Form 8-K) (Dec. 22, 2022) [hereinafter "Dec. 22, 2022 Form 8-K"] (announcing entry into Antara Transaction); Dec. 22, 2022 Form 8-K, Ex. 10.1 (memorializing Antara Transaction).

[168] Dec. 22, 2022 Form 8-K.

supported by consideration.[169] Over Izzo's Objection and exception, the July 21 Opinion also concluded the Release did not otherwise improperly release future claims.[170]

On July 22, the parties excised the problematic clause releasing APE claims.[171] I conclude that the recut Release comports with Delaware law: it is supported by consideration, does not release tangential claims, and only releases claims based on the identical factual predicate asserted in the complaints.[172]

### b) The Value Of The Released Claims

Plaintiffs brought two claims: one for breach of fiduciary duty asserted in both the operative complaint and the Allegheny complaint, and one for a violation of 8 *Del. C.* § 242(b)(2) in the Allegheny complaint. The parties agree the statutory claim was weak. They dispute the merits of the breach of fiduciary duty claim, but agree the Court was unlikely to issue a preliminary injunction.

---

[169] *AMC*, --- A.3d ---, 2023 WL 4677722, at *15–26.

[170] *Id.* at *24 n.186.

[171] D.I. 582.

[172] *AMC*, --- A.3d ---, 2023 WL 4677722, at *23 ("A release must be supported by consideration to be valid." (collecting cases)); *id.* ("In Delaware, the limiting principle is that a settlement can release claims that were not specifically asserted in the settled action, but only if those claims are based on the same identical factual predicate or the same set of operative facts as the underlying action." (quoting *Phila. Stock Exch.*, 945 A.2d at 1146)).

### i. The Section 242(b) Claim

The parties agree Plaintiffs' claim under Section 242(b)(2) was meritless.[173] That claim alleged that the "creation of the [APEs] . . . adversely affected the 'powers, preferences and special rights' of the Company's existing Class A common stockholders," and because the defendants "failed to seek approval from common stockholders" to issue the APEs, they violated Section 242(b)(2).[174]

By default, Section 242(b)(2) requires a class vote when the number of shares of that class is increased. But corporate charters can exempt corporations from that requirement.[175] AMC's Certificate has such an exemption provision.[176]

Plaintiffs' claim rested entirely on more nuanced language in Section 242(b)(2): "The holders of the outstanding shares of a class shall be entitled to vote

---

[173] *E.g.*, POB at 8, 35–37; DOB at 23–28.

[174] Non-Op. Compl. ¶¶ 101–102.

[175] 8 *Del. C.* § 242(b)(2) ("The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote irrespective of this subsection, if so provided in the original certificate of incorporation . . . .").

[176] AMC Entertainment Holdings, Inc., Registration Statement (Form S-3) (Dec. 30, 2020), Ex. 3.1, Third Amended and Restated Certificate of Incorporation of AMC Entertainment Holdings, Inc., at art. IV § D ("The number of authorized shares of any of the Common Stock or the Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority in voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL (or any successor provision thereto), and no vote of the holders of any of the Common Stock or the Preferred Stock voting separately as a class shall be required therefor.").

as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would . . . alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely."[177]  Plaintiffs' claim relied on the premise that the defendants "alter[ed] or change[d] the powers, preferences, or special rights of the shares of [common stock] so as to affect [the common stock] adversely."[178]

This claim would not have succeeded under current Delaware law.  In a seminal case colloquially referred to as *Dickey Clay*, the Delaware Supreme Court held that "[w]here the corporate amendment does no more than to increase the number of the shares of a preferred or superior class, the relative position of subordinated shares is [only] changed in the sense that they are subjected to a greater burden," but "[t]he peculiar, or special, quality with which they are endowed, and which serves to distinguish them from shares of another class, remains the same."[179] Similarly, in *Orban v. Field*, this Court explained, "[t]he language of [Section 242(b)(2)] makes clear that it affords a right to a class vote when the proposed amendment adversely affects the peculiar legal characteristics of that class of

---

[177] 8 *Del. C.* § 242(b)(2).

[178] *Id.*

[179] *Hartford Accident & Indem. Co. v. W. S. Dickey Clay Mfg.*, 24 A.2d 315, 318–19 (Del. 1942).

stock."[180]  Since "[t]he right to vote is not a peculiar or special characteristic of common stock in the capital structure," the mere "pro-rata dilut[ion]" to the voting power of the common stock caused by issued preferred shares with voting rights did not implicate Section 242(b)(2).[181]  This Court recently applied *Dickey Clay*'s holding in *In re Snap Inc. Section 242 Litigation.*[182]

*Dickey Clay* is dispositive here.  Even if the defendants effectuate the Proposals, the Proposals do not adversely affect the common stockholders' rights, powers, and preferences requiring a class vote under Section 242(b)(2).  Neither did the issuance of the APEs themselves.  Shares of AMC common stock had, and will continue to have, one vote per share:  dilution of that vote is not a harm cognizable under Section 242(b)(2).

Plaintiffs would not have been able to demonstrate a reasonable probability of success at the preliminary injunction stage, or achieve actual success on the merits, for their Section 242(b)(2) claim.  Releasing this claim has little value.

---

[180] 1993 WL 547187, at *7–8 (Del. Ch. Dec. 30, 1993) (emphasis omitted).

[181] *Id.* at *8.

[182] *In re Snap Inc. Section 242 Litig.*, Consol. C.A. No. 2022-1032-JTL, D.I. 22 at 33–34 (Del. Ch. Mar. 29, 2023) (TRANSCRIPT) ("The holding of *Dick[ey] Clay* is thus that relative position in the capital structure is not a right of the shares or, in the language of the decision, a quality of the shares such that authorizing more of a senior class or series or adding a senior class or series does not make an adverse change to the rights of the junior class or series."), *appeal filed* No. 120, 2023 (Del. Apr. 12, 2023).

### ii. The Breach Of Fiduciary Duty Claim

The parties dispute the merits, and therefore the value, of Plaintiffs' breach of fiduciary duty claim. The dispute centers on the applicable standard of review. Delaware law provides three tiers of review for evaluating director decisionmaking: the business judgment rule, enhanced scrutiny, and entire fairness.[183] If neither enhanced scrutiny nor entire fairness is warranted, the Court presumes the directors' actions are in good faith and informed: the result is usually dismissal of the claim.[184]

The parties dispute whether the Court has cause to apply enhanced scrutiny to the issuance and weaponization of the APE units as affecting the common stockholder franchise, or whether that conduct is insulated by the business judgment rule. Plaintiffs argue enhanced scrutiny would be warranted under *Blasius Industries, Inc. v. Atlas Corporation*.[185] The defendants contend the business judgment rule would apply, arguing *Blasius* review is not triggered by interference with stockholder voting outside the director election or change of control settings.[186]

Whether Plaintiffs' allegations trigger *Blasius* review was fairly debated under Delaware law as it existed at the time of settlement briefing: the scope and standard for *Blasius* review has been the subject of much mastication and

---

[183] *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

[184] *Id.*

[185] 564 A.2d 651 (Del. Ch. 1988).

[186] DOB at 18–22.

53

handwringing over the decades since *Blasius* was issued.[187]  The day before the Settlement Hearing, the Delaware Supreme Court contributed to that body of law with *Coster v. UIP Companies, Inc.* ("*Coster IV*").[188]  I asked the parties whether and how *Coster IV* should inform my consideration of Plaintiffs' breach of fiduciary duty claim.[189]

Under my reading of *Blasius* and the law that followed, including *Coster IV*, the business judgment rule would not have applied to Plaintiffs' breach of fiduciary duty claim.  Directorial usurpation of stockholder voting power can inspire enhanced scrutiny regardless of the topic of the vote or its effect on corporate control.  Case

---

[187] *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 805 (Del. Ch. 2007) ("[O]ur law has struggled to define with certainty the standard of review this court should use to evaluate director action affecting the conduct of corporate elections."); *In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 677–78 (Del. Ch. 2004) ("In *MM Companies, Inc. v. Liquid Audio, Inc.*, the Supreme Court recognized that there is a 'substantial degree of congruence between the rationale that led to the *Blasius* "compelling justification" enhanced standard of judicial review and the logical extension of that rationale *within* the context of the *Unocal* enhanced standard of review." (emphasis in original) (footnoted omitted) (quoting 813 A.2d 1118, 1129 (Del. 2003))); *id.* at 678 ("Cases in which both *Blasius* and *Unocal* review are implicated involve measures by a board with the primary purpose to preclude or, at least, impede the effective exercise of the shareholder franchise *and* the board's control of the corporation is at play." (citing *Liquid Audio*, 813 A.2d at 1131, and *Stroud v. Grace*, 606 A.2d 75, 92 n.3 (Del. 1992))); *Pell v. Kill*, 135 A.3d 764, 785 (Del. Ch. 2016) ("[T]he Delaware Supreme Court has made clear that *Blasius* is a form of enhanced scrutiny in which the compelling justification concept from that decision is applied '*within* the . . . enhanced standard of judicial review.'  Writing while serving on this court, Chief Justice Strine likewise explained the role of *Blasius* within the larger context of the intermediate standard of enhanced scrutiny." (emphasis in original) (footnotes omitted)).

[188] --- A.3d ---, 2023 WL 4239581 (Del. June 28, 2023).

[189] Hr'g Tr. 225–26, 233, 235–36, 254; D.I. 587 at 6 (citing *Coster IV*, --- A.3d ---, 2023 WL 4239581).

54

law blending *Blasius* with other enhanced scrutiny doctrines does not foreclose applying *Blasius* alone. Delaware law urges restraint in applying *Blasius* enhanced scrutiny alone, but it need not be coupled to another doctrine to have legs. Delaware law teaches that *Blasius*'s original formulation, requiring directors to prove they had a compelling justification for thwarting the franchise, is too potent for contexts in which the vote does not touch on corporate control.

This opinion concludes that where a plaintiff establishes directors acted with the primary purpose of impeding the exercise of stockholder voting power for a vote on issues other than corporate control, in the absence of another basis to apply enhanced scrutiny, the directors must demonstrate their actions were reasonable in relation to their legitimate objective. Applying that standard to Plaintiffs' claims, I conclude Plaintiffs established the director defendants acted with that disenfranchising purpose in issuing the APEs, entering into the Deposit Agreement, and entering into the Antara Transaction. In this settlement context, the limited record does not convince me that those actions were reasonable: Plaintiffs' claim has value. But the defendants may have been able to prevail, if not on the merits then on the equities of a preliminary injunction, by demonstrating the Proposals and Conversion were necessary to save AMC from imminent bankruptcy. The value of Plaintiffs' claim is therefore discounted.

### A. *Blasius* Enhanced Scrutiny Can Be Triggered Outside The Corporate Control Context.

"Enhanced scrutiny is Delaware's intermediate standard of review."[190]

> Delaware courts deploy enhanced scrutiny in specific, recurring situations marked by two features. First, there is an identifiable decision-making context where the realities of the situation "can subtly undermine the decisions of even independent and disinterested directors." "Inherent in these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference [under the business judgment rule]." Second, the decision under review involves the fiduciary intruding into a space where stockholders possess rights of their own. The fiduciary's exercise of corporate power therefore raises questions about the allocation of authority within the entity and, from a theoretical perspective, implicates the principal-agent problem.[191]

In other words, enhanced scrutiny is triggered when directors face, or are likely to face, conflicts with stockholder interests or stockholder rights, such that the presumption that they are conflict-free is set aside. Enhanced scrutiny can be triggered by (i) situational conflicts inherent in certain factual circumstances, like a potential change of control or cash-out transaction presenting a conflict between maximizing stockholder value and directors keeping their seats; or (ii) conflicts between directors and stockholders in which the directors act to take stockholders'

---

[190] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013).

[191] *In re Columbia Pipeline Grp., Merger Litig.*, --- A.3d ---, 2023 WL 4307699, at *50 (Del. Ch. June 30, 2023) (citations and footnote omitted) (quoting *Trados*, 73 A.3d at 43, and then *In re Rural Metro Corp.*, 88 A.3d 54, 82 (Del. Ch. 2014)).

56

power away from them, like by impinging on their right to tender their shares, vote on a merger, or vote in an election.[192]

*Blasius* enhanced scrutiny is triggered by the second type of conflict, when directors impinge on stockholders' right to vote.[193] *Blasius* examined board action taken with the primary purpose of preventing stockholders from electing their chosen directors.[194] The incumbent board was not motivated by selfish entrenchment, but rather a desire to slow down an investor's pursuit of a leveraged restructuring and cash distribution that the board thought was not in the company's best interest.[195] Even though the board acted in good faith and with due care, Chancellor Allen found judicial scrutiny of the board's action was warranted.[196]

He explained that stockholder voting rights are "critical to the theory that legitimates" a board's power over the stockholders' property.[197] "[A] decision by the board to act for the primary purpose of preventing the effectiveness of a

---

[192] *Id.* at *50–52.

[193] *Id.* at *52; *Blasius*, 564 A.2d at 660–61.

[194] 564 A.2d at 663.

[195] *Id.* at 658.

[196] *Id.* at 659–62.

[197] *Id.* at 659; *accord Liquid Audio*, 813 A.2d at 1126 ("Accordingly, while these 'fundamental tenets of Delaware corporate law provide for a separation of control and ownership,' the stockholder franchise has been characterized as the 'ideological underpinning' upon which the legitimacy of the directors['] managerial power rests." (footnotes omitted)); *see also supra* note 191, and accompanying text.

shareholder vote inevitably involves the question who, as between the principal and the agent, has authority with respect to a matter of internal corporate governance."[198] When the board intrudes into or infringes the stockholders' voting authority, the board interferes with the allocation of governance power between the board and the stockholders.[199] Chancellor Allen explained:

> Action designed principally to interfere with the effectiveness of a vote inevitably involves a conflict between the board and a shareholder majority. Judicial review of such action involves a determination of the legal and equitable obligations of an agent towards his principal. This is not, in my opinion, a question that a court may leave to the agent finally to decide so long as he does so honestly and competently; that is, it may not be left to the agent's business judgment.[200]

Accordingly, the Court reviewed the board's action with enhanced scrutiny, and determined the board acted "for the primary purpose of impeding the exercise of stockholder voting power."[201] After reasoning such acts were not void per se, the Chancellor stated that the challenged actions would stand if the board had a "compelling justification for such action[s]."[202] On the facts before him, the board lacked a compelling justification.[203]

---

[198] *Blasius*, 564 A.2d at 659–60.

[199] *Id.* at 660.

[200] *Id.*

[201] *Id.* at 661.

[202] *See id.*

[203] *Id.* at 663–64.

*Blasius* review was inspired by the very fact of a board's intent to disrupt the allocation of power between the board and the stockholders, not because the directors might otherwise lose their seats. The conflict warranting enhanced scrutiny arose within the relationship between the board and the stockholders, rather than from an external factual situation that might cast doubt on directors' loyalty. *Blasius* explains that an entrenchment motive is not necessary to trigger enhanced scrutiny; any attempt by directors to seize power from stockholders presents a conflict that vaporizes the protections of the business judgment rule.[204]

In the decades that followed *Blasius*, Delaware law recognized the unsurprising fact that director impingement of the franchise frequently occurred in the context of director elections or a change of control. Those contexts give rise to not only the franchise conflict warranting *Blasius* review, but also a situational conflict on the part of directors wishing to keep their seats.[205] Our courts recognized that claims that directors impinged the franchise in director elections inspire enhanced scrutiny under both *Unocal*[206] and *Blasius*.[207] Our courts endeavored to

---

[204] *Id.* at 652, 659.

[205] *E.g.*, *Pell*, 135 A.3d at 765–76.

[206] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).

[207] *Coster IV*, --- A.3d ---, 2023 WL 4239581, at *8–11 (discussing *Stroud*, 606 A.2d 75, and *Chesapeake Corp. v. Shore*, 771 A.2d 293 (Del. Ch. 2000), and *Liquid Audio*, 813 A.2d 1118, and *Mercier*, 929 A.2d 786, and *Pell*, 135 A.3d 764, and *Strategic Inv. Opps. LLC v. Lee Enters.*, 2022 WL 453607 (Del. Ch. Feb. 14, 2022)); *Columbia Pipeline*, --- A.3d ---,

simplify our law and enumerate one enhanced scrutiny test for such

circumstances.[208] They "strove to bring the *Blasius* and *Unocal* standards together

2023 WL 4307699, at *52 ("Recently [in *Coster IV*], the Delaware Supreme Court said so explicitly, holding that *Blasius* review is just that: a version of the enhanced judicial scrutiny first recognized in *Unocal*. The high court took the additional step of retiring the compelling justification concept. Instead, in the context of a corporate election or a stockholder vote involving corporate control, the board must identify a legitimate threat and then 'tailor its response to only what is necessary to counter the threat.' Moreover, the board's response 'cannot deprive the stockholders of a vote or coerce the stockholder to vote a particular way.' What results is enhanced scrutiny applied with a special sensitivity to the stockholder franchise." (citations omitted)); *see also Stroud*, 606 A.2d at 92 n.3 (observing *Unocal* and *Blasius* "are not mutually exclusive" in a situation such as "[b]oard action interfering with the exercise of the franchise [arising] during a hostile contest for control"); *Chesapeake*, 771 A.2d 293 (applying a modified *Unocal* review to the board's imposition of a supermajority voting requirement for stockholder-initiated bylaw changes in an effort to reduce the voting power of two stockholders in particular); *Liquid Audio*, 813 A.2d 1118 (applying a modified *Unocal* review where the Liquid Audio board responded to MM's takeover efforts by expanding the board from five to seven members and filling the new seats, which with a staggered board, defeated MM's ability to control the board following the annual meeting); *Mercier*, 929 A.2d 786 (applying a modified *Unocal* review where a special committee of independent directors rescheduled a stockholder special meeting to consider a proposed merger that would have affected the control of the company); *Pell*, 135 A.3d 764 (applying a modified *Unocal* review where, in advance of its annual meeting and a looming proxy fight, the incumbent board reduced from three to one the Class I director seats up for election, ensuring their continued control of the company through a three-to-two majority); *Strategic Inv. Opps.*, 2022 WL 453607 (applying enhanced scrutiny where the board rejected a slate of board nominees for noncompliance with the company's advance notice bylaw); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *1, *27–29 (Del. Ch. May 31, 2022) (applying a blended review under *Mercier* and *Pell* where "the Board expressly instructed the inspector of elections not to count a certain number of votes from particular stockholders . . . to interfere with the effective exercise of the shareholder franchise in a contested election for directors"), *aff'd sub nom. CCSB Fin. Corp. v. Totta*, --- A.3d ---, 2023 WL 4628822 (Del. July 19, 2023).

[208] *MONY*, 853 A.2d at 678 (citing *Liquid Audio*, 813 A.2d at 1131, and *Stroud*, 606 A.2d at 92 n.3)); *Columbia Pipeline*, --- A.3d ---, 2023 WL 4307699, at *52–53 (citations omitted).

in a workable manner"[209] in order to accomplish "close scrutiny of director action that could have the effect of influencing the outcome of corporate director elections or other stockholder votes having consequences for corporate control."[210]

I read *Coster IV* to be the next chapter in that jurisprudence addressing *Blasius* and *Unocal* together in the context of a director election. In considering a stock issuance designed to break an election deadlock, the Court of Chancery "found that the UIP board had not acted for inequitable purposes and had compelling justifications for the dilutive stock issuance" under *Schnell* and *Blasius*.[211] The Supreme Court affirmed, and explained that "*Blasius* first applied that enhanced review by requiring a board, even if acting in good faith, to demonstrate a 'compelling justification' for interfering with the stockholder franchise."[212] But "when the board interferes with the stockholder vote during a contest for control," *Unocal* review is appropriate.[213] *Coster IV* discussed the evolution of joining "*Unocal*'s reasonableness review and *Blasius*'[s] 'primary purpose' and 'compelling justification' elements into a useful standard of review" when a board infringes on

[209] *Mercier*, 929 A.2d at 809; *see Liquid Audio*, 813 A.2d at 1129–31.

[210] *Mercier*, 929 A.2d at 810.

[211] *Coster IV*, --- A.3d ---, 2023 WL 4239581, at *1, *5 (referring to *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437 (Del. 1971)).

[212] *Id.* at *8.

[213] *Id.*

the stockholder franchise in matters of corporate control.[214] "Experience has shown that *Schnell* and *Blasius* review, as a matter of precedent and practice, have been and can be folded into *Unocal* review to accomplish the same ends—enhanced judicial scrutiny of board action that interferes with a corporate election or a stockholder's voting rights in contests for control."[215] *Coster IV* speaks to *Blasius* review only in the context of a contest for control, like the many cases that considered both *Blasius* and *Unocal* before it.[216]

While *Blasius* review and *Unocal* review can be inspired by the same facts, "*Blasius* does not only apply in cases involving hostile acquirers or directors wishing to retain their position against the will of the shareholders."[217] "Enhanced scrutiny . . . is not limited to electoral contests where the entire board might be replaced. Enhanced scrutiny also applies in other situations where the law provides stockholders with a right to vote and the directors take action that intrudes on the

---

[214] *Id.* at *9; *id.* at *8–11.

[215] *Id.* at *11 (citing Lawrence A. Hamermesh et al., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective and Look Ahead*, 77 BUS. LAW. 321, 331 (2022)).

[216] *See id.* at *12 ("As we explained in our earlier decision in this case, the court's review is situationally specific and is independent of other standards of review." (footnote omitted)).

[217] *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *13 (Del. Ch. Dec. 4, 2000).

space allotted for stockholder decision-making."[218] Every stockholder vote presents the opportunity for directors to seize power from stockholders.[219] Stockholders enjoy the power and right to vote on issues in addition to corporate control. The General Assembly has afforded stockholders voting rights on stock increases, stock decreases, rights, powers, preferences, and leasing substantially all of the company's assets.[220] Delaware law reveres all stockholder voting rights as sacrosanct.[221] Directorial usurpation of stockholders' power to speak for themselves on issues other than corporate control still presents the conflict identified in *Blasius*.

In *State of Wisconsin Investment Board v. Peerless Systems Corporation*, Chancellor Chandler applied *Blasius* enhanced scrutiny to board intrusion into the

---

[218] *Pell*, 135 A.3d at 786 (Del. Ch. 2016) (quoting *Reis*, 28 A.3d at 457, and citing *Peerless*, 2000 WL 1805376, at *10–11).

[219] *Peerless*, 2000 WL 1805376, at *13 ("The derivation of board power from shareholders, as well as the allocation of power with respect to governance of the corporation, are broad structural concerns within the corporate form that are present in any shareholder vote."); *see Blasius*, 564 A.2d at 659–60.

[220] *See* 8 *Del. C.* § 242(b)(2); 8 *Del. C.* § 271(a).

[221] *E.g.*, *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012); *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del. 1994) ("Because of the overriding importance of voting rights, this Court and the Court of Chancery have consistently acted to protect stockholders from unwarranted interference with such rights." (collecting cases)). Indeed, this Court will award fees under the corporate benefit doctrine when a litigant preserves the stockholder franchise. *See, e.g.*, *EMAK*, 50 A.3d at 433 ("Shareholders have limited opportunities to exercise their right to vote. When plaintiff's counsel obtains a corporate benefit by protecting shareholder voting rights, the benefit's size does not depend on the corporation's monetary value. The Vice Chancellor correctly found that the *Kurz* and *Crown* litigation produced a corporate benefit by preserving the EMAK shareholders' voting rights.").

franchise outside the director election context.[222] Three proposals were presented for a vote at the company's annual meeting.[223] Two proposals passed at the meeting, in part because they were routine matters that permitted brokers to vote uninstructed shares, and those polls closed.[224] The third proposal ("Proposal 2") was a nonroutine proposal to add shares to the stock option plan.[225] Proposal 2 required beneficial owners to vote their shares, but much of Peerless's stockholder base comprised European investors facing logistical hurdles that frustrated and suppressed their votes.[226] At the time of the annual meeting, Proposal 2 would have been defeated; the plaintiff had solicited against it.[227]

The company's chairman, CEO, and president adjourned the annual meeting, thereby postponing the closing of the polls on Proposal 2.[228] The defendants "went out and tried to gather enough votes to put the [open] proposal over the top"[229] from selected stockholders "who were more likely to support management and vote in favor of Proposal 2," without informing all the stockholders about the adjournment

---

[222] 2000 WL 1805376.

[223] *Id.* at *3.

[224] *Id.* at *3–4.

[225] *Id.* at *1–2, *4.

[226] *Id.* at *4.

[227] *Id.*

[228] *Id.* at *3.

[229] *Mercier*, 929 A.2d at 811 n.78 (discussing *Peerless*, 2000 WL 1805376).

or the continued solicitation.[230]  Thirty days later, the company reconvened the meeting, the chairman closed the polls, and Proposal 2 passed.[231]

*Peerless* began by "reaffirm[ing] the fundamental importance of the voting rights of shareholders in Delaware law" and *Blasius*'s foundation in the allocation of power between stockholders and directors.[232]  *Peerless* noted that "the concerns identified by Chancellor Allen remain fundamental tenets which guide this Court in any dispute concerning the shareholder franchise."[233]  *Peerless* stated that "*Blasius* does not apply in all cases where a board of directors has interfered with a shareholder vote," and proceeded to consider cases in which director infringement of franchise rights had not warranted *Blasius* scrutiny.[234]  Those cases failed to trigger *Blasius* scrutiny not because of the type of vote or type of director action, but because there was no evidence that the primary purpose was to impede the vote.[235]

---

[230] *Peerless*, 2000 WL 1805376, at *5.

[231] *Id.*

[232] *Id.* at *7–8.

[233] *Id.* at *8.

[234] *Id.* at *8–9.

[235] *Williams v. Geier*, 671 A.2d 1368, 1376 (Del. 1996) (noting the absence of evidence to support a primary purpose to impede the vote, and that the proxy explained the directors were motivated by a desire to promote long-term planning, permit the issuance of additional shares, and discourage hostile takeovers); *Stroud*, 606 A.2d at 95 (holding *Blasius* and *Unocal* inapplicable in the absence of "unilateral board action intended to inequitably manipulate the corporate machinery"); *Apple Comput., Inc. v. Exponential Tech., Inc.*, 1999 WL 39547, at *5 (Del. Ch. Jan. 21, 1999) ("In the absence of a hostile acquirer or some other motivation for disenfranchising the shareholders, however, a

*Peerless* applied *Blasius*'s compelling justification formulation: when the primary purpose of a board of directors' actions is to impede the effective exercise of the shareholder franchise, the board must demonstrate a compelling justification for such action.[236] *Peerless* emphasized these elements are distinct: "The question of purpose asks for what ultimate ends were the acts committed. Purpose is defined as '[a]n objective, goal, or end.' The concept of justification concerns the rationale behind the search for that end. Justification is defined as '[a] lawful or sufficient reason for one's acts or omissions.'"[237]

On summary judgment, the Court concluded the record demonstrated that "the primary purpose behind the adjournment was to ensure the passage of Proposal 2 by interfering with the shareholder vote and allowing Proposal 2 to have more time to gain votes."[238] Importantly,

---

board's *unintentional* failure to fulfill its supposed § 271 obligations, while perhaps constituting a breach of fiduciary duty, does not ordinarily trigger *Blasius* review." (emphasis added) (citing *Williams*, 671 A.2d at 1376)).

[236] *Peerless*, 2000 WL 1805376, at *8 ("*Blasius* sets forth a relatively simple, yet extremely powerful, two-part test based on the duty of loyalty. Under that test, first the plaintiff must establish that the board acted for the primary purpose of thwarting the exercise of a shareholder vote. Second, the board has the burden to demonstrate a compelling justification for its actions. Under this second prong, even where the Court finds that the action taken by the board was made in good faith, it may still constitute a violation of the duty of loyalty." (footnotes omitted)); *Blasius*, 564 A.2d at 661.

[237] *Peerless*, 2000 WL 1805376, at *11 (internal quotation marks and emphasis omitted) (quoting *Justification*, BLACK'S LAW DICTIONARY 870–71 (7th ed. 1999), and *Purpose*, BLACK'S LAW DICTIONARY 1250 (7th ed. 1999)).

[238] *Id.*

66

This finding that the primary purpose of the adjournment was to interfere with the shareholder vote on Proposal 2 in no way indicates that the defendants acted in bad faith in calling for the adjournment. Even in the worst case scenario, it appears only that the defendants misapprehended an admittedly difficult legal principle. In short, I assume that the defendants acted in good faith at all times. Nevertheless, I may still find that the defendants violated the fiduciary duty of loyalty. *Blasius* is highly instructive on this point, as Chancellor Allen held that "even finding the action taken was in good faith, it constituted an unintended violation of the duty of loyalty that the board owed to the shareholders."[239]

The Court then put the defendants to their heavy burden of demonstrating a compelling justification for thwarting a vote on an issue other than corporate control.[240]

In the years since *Peerless*, Delaware law has commended restraint in applying enhanced scrutiny, particularly under the compelling justification formulation, to a franchise conflict on a vote that does not inform corporate control.[241] The right to vote on directors is the "most important[]" of the

---

[239] *Id.* at *12 (quoting *Blasius*, 564 A.2d at 663).

[240] *Id.* at *12–15 (explaining the Court was not convinced on the plaintiffs' motion for summary judgment that the defendants fell short).

[241] *Mercier*, 929 A.2d at 808 ("[T]he reasoning of *Blasius* is far less powerful when the matter up for consideration has little or no bearing on whether the directors will continue in office."). In considering *Peerless* specifically, *Mercier* observed Delaware law afforded "more traditional," less potent tools to address other issues: *Schnell*, for review of the post-adjournment partial solicitation effort; entire fairness, for review of the effect of the CEO's self-interest (as the *Peerless* defendants requested, see 2000 WL 1805376, at *8); and the ability to enjoin board action in the face of "misleading or incomplete disclosures." *Mercier*, 929 A.2d at 811 n.78 (referring to *Schnell*). These tools address other reasons to set aside the business judgment rule or enjoin director action, namely bad faith, self interest,

stockholders' rights to vote.[242]  While even good faith director intrusion into stockholder voting power presents an conflict, intrusion into stockholder voting power on director elections more plainly smacks of self-interested disloyalty.  Cases considering the burden to show a compelling justification "display understandable discomfort about using such a stringent standard of review in circumstances when a stockholder vote has no bearing on issues of corporate control."[243]  And Delaware law is clear that ministerial board functions affecting the franchise, such as "scheduling the meeting and record dates, deciding on a location for the meeting, choosing inspectors of elections, or retaining proxy solicitors," are shielded from *Blasius* enhanced scrutiny in order to ensure an orderly voting process.[244]

---

and uninformed voters.  *Coster v. UIP Cos., Inc.* (*Coster III*), 2022 WL 1299127, at *9 (Del. Ch. May 2, 2022) ("Heeding the policy determination that *Schnell* should be deployed sparingly, this decision interprets *Schnell*, when considered in the category of stockholder-franchise challenges, as applicable in the limited scenario wherein the directors have no good faith basis for approving the disenfranchising action.  That factual finding can be made based on evidence that speaks directly to subjective intent.  That factual finding also can made when objective evidence discredits proffered business reasons for the decision."), *aff'd*, *Coster IV*, --- A.3d ---, 2023 WL 4239581.

[242] *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *7 (Del. Ch. Oct. 28, 2010) ("Stockholders exercise their authority over corporate affairs by way of ballots.  Accordingly, the right to vote on certain matters—most importantly the election of directors—is a fundamental power reserved to the stockholders." (footnote omitted)).

[243] *Mercier*, 929 A.2d at 809 (citing *MONY*, 853 A.2d at 675 n.51, and *Peerless*, 2000 WL 1805376 at *8–9)).

[244] *MONY*, 853 A.2d at 675; *accord Mercier*, 929 A.2d at 809 (noting that while directors cannot "use inequitable means that dupe or dragoon stockholders into consenting," they "can use the legal means at their disposal to pursue stockholder approval," such as "the ability to set and revise meeting dates or to adjourn a convened meeting" (footnote

Still, as *Mercier* pointed out, the "key issue" warranting *Blasius* review "is whether directors were ultimately preventing stockholders from freely exercising the right to vote on a matter committed to them."[245] Even among the cornucopia of other doctrines warranting judicial intervention, *Blasius* review still has a role, and can still be triggered, in the context of a vote on matters other than corporate control. That our *Blasius* caselaw has naturally developed in the *Unocal* setting does not preclude *Blasius* from being prudently applied in other settings. Where a board's nonministerial intrusion into the stockholder franchise generates a conflict between the board and the stockholders, even in and especially in the absence of a situational conflict, self interest, bad faith, negligence, or disclosure violations, *Blasius* scrutiny remains warranted.

---

omitted)); *Blasius,* 564 A.2d at 663 ("[T]here is a vast difference between expending corporate funds to inform the electorate and exercising power for the primary purpose of foreclosing effective shareholder action.").

    *Blasius* disclaimed any need for a plaintiff to show that the fiduciary was self-interested. *See Blasius*, 564 A.2d at 652, 658–59. Subsequent authority has made plain that *Unocal* blended with *Blasius*, or entire fairness, are preferable tools to address self-interested behavior, and *Schnell* addresses bad faith. *Mercier*, 929 A.2d at 811 n.78; *Coster III*, 2022 WL 1299127, at *9. I accordingly do not limit *Blasius* as far as *MONY* did. *See MONY*, 853 A.2d at 674 (stating that outside the context of director elections, "courts will apply the exacting *Blasius* standard . . . only in circumstances in which self-interested or faithless fiduciaries act to deprive stockholders of a full and fair opportunity to participate in the matter and to thwart what appears to be the will of a majority of the stockholders").

[245] *Mercier*, 929 A.2d at 809 n.65 (citing *Blasius*, 564 A.2d at 663).

In a case warranting enhanced scrutiny based solely on a franchise conflict and not a situational conflict, the formulation of enhanced scrutiny considering the reasonableness of board action in view of both franchise and situational conflicts together should not be blindly applied.[246] That said, concerns about the undue potency of *Blasius* stemmed from its stringent "compelling justification" standard.[247] Since *Peerless*, in the more concerning change of control setting, the "compelling justification" standard has been defined to mean reasonableness with a "closer fit between means and ends" or viewed with a "gimlet eye."[248] *Coster IV* surveyed that

---

[246] *Mercier*, 929 A.2d at 810–11. *Pell v. Kill* describes *Mercier*'s three-part blended *Unocal* test, requiring "reasonable" fit to a legitimate objective, as governing "director action that affects stockholder voting," and then proceeds to contrast that test with *Liquid Audio*'s requirement that "when the vote involves an election of directors or touches on matters of corporate control, the directors' justification must not only be 'reasonable' but also 'compelling.'" *Pell*, 135 A.3d at 787 (citing *Liquid Audio*, 813 A.2d at 1129–30)). "In th[at] context, the shift from 'reasonable' to 'compelling' requires that the directors establish a closer fit between means and ends." *Id.* (citing *Mercier*, 929 A.2d at 819). Because the *Mercier* test was designed for a *Unocal* setting, I do not read *Pell* to extend that test to all "director action that affects stockholder voting" beyond that setting, to wholly replace *Blasius*. Nor do I believe my conclusion that *Blasius* alone still operates outside the corporate control setting runs afoul of *Mercier*'s instructions not to extend its blended *Blasius-Unocal* test outside that setting. *See Mercier*, 929 A.2d at 810–11.

[247] *Coster IV*, --- A.3d ---, 2023 WL 4239581, at *9 ("The *Blasius* 'compelling justification' standard of review turned out to be unworkable in practice. Once the court required a compelling justification to justify the board's action, the outcome was, for the most part, preordained." (collecting authorities)); *Mercier*, 929 A.2d at 811 n.78 (discussing *Peerless*: "[The Court] determined that the *Blasius* standard applied, even while acknowledging that it was 'problematic' to apply the powerful *Blasius* standard to a stockholder vote in a situation that did not involve 'entrenchment or control issues.'" (citing *Peerless*, 2000 WL 1805376, at *12)).

[248] *Coster IV*, --- A.3d ---, 2023 WL 4239581, at *9 (recognizing over the years the Court of Chancery has "redefin[ed] what it meant to be compelling" (collecting cases)); *see also*

70

authority and "took the additional step of retiring the compelling justification concept. . . . in the context of a corporate election or a stockholder vote involving corporate control."[249] Outside the director election or corporate control setting, I read the weight of authority to call for a reasonableness analysis and to permit the "fit" between the means and ends to be looser than in the corporate control setting.[250]

In this case, so far as I can see, a *Blasius* conflict is the only conflict warranting enhanced scrutiny of Plaintiffs' claims, and the only basis for relief. The stockholder

*Coster III*, 2022 WL 1299127, at *11 ("The compelling-justification test has been described colorfully as calling for the court to view the directors' explanations with a gimlet eye." (citing *Pell*, 135 A.3d at 787, and *Williams*, 671 A.2d at 1376)); *Pell*, 135 A.3d at 787 ("The Delaware Supreme Court has held that when the vote involves an election of directors or touches on matters of corporate control, the directors' justification must not only be 'reasonable' but also 'compelling.' In this context, the shift from 'reasonable' to 'compelling' requires that the directors establish a closer fit between means and ends. Although linguistically reminiscent of the type of review given to suspect classifications under the federal constitution, the use of the word 'compelling' is not intended to signal that type of strict scrutiny. Instead, it is a reminder for courts to approach directorial interventions that affect the stockholder franchise with a 'gimlet eye.'" (quoting *Liquid Audio*, 813 A.2d at 1129–30, then citing *Mercier*, 929 A.2d at 819, then quoting *Chesapeake*, 771 A.2d at 323)); *Totta*, 2022 WL 1751741, *28 ("To satisfy the compelling-justification standard, the directors must show that their actions were reasonable in relation to their legitimate objective, and did not preclude the stockholders from exercising their right to vote or coerce them into voting a particular way. In this context, the shift from reasonable to compelling requires that the directors establish a closer fit between means and ends." (internal quotation marks omitted) (footnotes omitted) (quoting *Mercier*, 929 A.2d at 810–11, and then *Pell*, 135 A.3d at 787)).

[249] *Columbia Pipeline*, 2023 WL 4307699, at *52 (citing *Coster IV*, --- A.3d ---, 2023 WL 4239581, at *8, *12).

[250] *See Columbia Pipeline*, 2023 WL 4307699, at *52–53 (surveying tests for enhanced scrutiny and summarizing them as "call[ing] for the fiduciaries to establish that they (i) acted for a proper purpose and (ii) selected an appropriate means of achieving that purpose").

71

voting rights at stake were not in a contest for control, so *Unocal* scrutiny is not warranted. Plaintiffs have not pled self interest, bad faith, or negligence. The Court's other tools for reviewing or enjoining director action are inapposite here. As explained, there is no viable Section 242(b)(2) claim. *Schnell*[251] is also a poor fit: as in *Coster*, the evidence does not support a finding of bad faith.[252] The board's justification (as distinct from its purpose) was to advance the best interests of AMC and save it from financial peril.[253] Plaintiffs make rumblings about the adequacy of the disclosure of the Deposit Agreement, and the truthfulness of statements accompanying the APE issuance that no conversion was intended.[254] But those disclosure issues are thin reeds to hold the weight of the injunction sought here. And the defendants' actions were nonministerial: they comprised much more than scheduling a meeting, moving a record date, or retaining a proxy solicitor.[255] Having concluded *Blasius* review is available, I proceed to evaluate Plaintiffs' call for enhanced scrutiny.

---

[251] 285 A.2d 437.

[252] *Coster III*, 2022 WL 1299127, at *10; *see also Coster IV*, --- A.3d ---, 2023 WL 4239581, at *2.

[253] *Coster III*, 2022 WL 1299127, at *10; *see AMC*, --- A.3d ---, 2023 WL 4677722, at *6 ("Without the ability to authorize more shares, AMC could not raise capital by issuing more common stock. AMC developed an alternative. . . . AMC and its advisors decided that selling preferred stock could raise capital and that the votes associated with the preferred stock could carry the Certificate amendment." (footnotes omitted)).

[254] *E.g.*, Op. Compl. ¶¶ 21, 108–110.

[255] *MONY*, 853 A.2d at 674–75.

### B. Plaintiffs' Allegations Warrant *Blasius* Enhanced Scrutiny.

Plaintiffs alleged the defendants interfered with the common stockholders' voting on the Proposals at the Special Meeting.[256] The Board used its authority under the charter to create blank check stock, and its authority to enter into contracts on the Company's behalf to imbue that stock with dispositive voting power.[257] Under the Deposit Agreement, any uninstructed APE units vote in proportion to the instructed APE units.[258] The proportional feature enables the APE units to dictate the outcome of any vote on which the common shares and the preferred units vote together.[259] Antara's promise to vote its APE units received in the Antara Transaction in favor of the Proposals, together with the mirrored voting feature, ensured the Proposals' approval by a combined vote of the APE units and common stock.[260]

---

[256] Op. Compl. ¶¶ 1, 3, 12, 37, 152, 164.

[257] POB at 14–18; POB, Ex. 11, at AMC_00005304–5305; POB, Ex. 10, Meeting Materials for July 28, 2022 Meeting of the Board of Directors of AMC Entertainment Holdings, Inc., at AMC_00005215.

[258] Deposit Agr. § 4.5.

[259] *AMC*, --- A.3d ---, 2023 WL 4677722, at *7.

[260] Op. Compl. ¶¶ 126, 148–149; Dec. 22, 2022 Form 8-K; Feb. 14, 2023 Proxy at 6 ("On the Record Date, Antara Capital LP ([] 'Antara') owned and was entitled to vote an aggregate of 258,439,472 APEs, representing 17.8% of AMC's issued and outstanding shares of Common Stock and APEs (with each APE representing 1/100 of a share of Series A Preferred Stock), and plans to vote in favor of the Share Increase Proposal and the Reverse Split Proposal, and, if presented, we also anticipate they will also vote in favor of the Adjournment Proposal."); Dec. 21, 2022 Board Minutes at AMC_00005968 (approving

The record before me supports Plaintiffs' argument that the defendants took actions with the primary purpose of overcoming the stockholders' voting behavior. Before they interfered with the franchise, the defendants made other adjustments to AMC's machinery to try to secure their preferred results despite the retail stockholders' antipathy or apathy. Before the defendants created the preferred stock that would become the APE units, entered the Deposit Agreement, or entered into the Antara Transaction, they faced stockholder opposition to their proposed certificate amendment increasing authorized shares of common stock. After once withdrawing a proposed amendment due to lack of stockholder approval, the defendants amended the Company's bylaws to lower the quorum requirement from a majority to one-third of the issued and outstanding stock entitled to vote at the meeting.[261] Then, the defendants sought the help of their proxy advisor to suggest alternative voting structures that could overcome the lack of "for" votes the

the Antara Transaction, the AMC Board specifically noted that "AMC had a good chance to secure approval" of the Proposals, given that there were more APEs than common shares and the APE unitholders would likely want to convert their units to common shares).

[261] Op. Compl. ¶¶ 66–67, 71; Non-Op. Compl. ¶ 39; POB, Ex. 7 at AMC_00004343 (discussing lowering quorum requirement, citing the fact that "nearly 85% of AMC's stock is held by retail investors," and "obtaining a quorum this year has proven challenging"); *id.* at AMC_00004350 ("WHEREAS, the Corporation's stockholder base has become more diverse with a large number of retail stockholders with small shareholdings making it more difficult to obtain the necessary quorum; and WHEREAS, the Board has determined that it is in the best interests of the Corporation and its stockholders to reduce the amount of stock necessary to constitute a quorum at meetings of stockholders while still ensuring meaningful participation by stockholders." (emphasis omitted)).

74

Company expected.[262]  The defendants tried again to propose an amendment to increase the authorized shares of common stock, and again withdrew this attempt when it was clear the electorate was not on board.[263]

Out of other ideas, the defendants created the APE units and entered the Deposit Agreement.  Plaintiffs would likely have been able to establish they did so with the purpose of rendering the common stockholders' votes irrelevant via the APE units' proportionate voting structure, and the justification of securing a charter amendment authorizing more common stock.[264]  The defendants then guaranteed the Proposals would pass despite common stockholder opposition or nonvotes when they entered the Antara Transaction, securing Antara's votes in favor of the

[262] POB, Ex. 20 at AMC_00019707–08 (emailing with AMC's proxy advisor to structure stockholder votes as either "[d]iscretionary voting – where brokers will vote any uninstructed shares with management's recommendations" or "[p]roportionate voting – where brokers will vote any uninstructed shares in the same proportion that their instructed shares were voted" to maintain an "advantage" of favorable votes).

[263] Op. Compl. ¶ 74; Non-Op. Compl. ¶¶ 41, 45; AMC Entertainment Holdings, Inc., Preliminary Proxy Statement (Schedule 14A), at 11–12 (June 3, 2021); POB at 14 (citing POB, Ex. 23, and POB, Ex. 26, and POB, Ex. 30, and POB, Ex. 32); *see also AMC*, --- A.3d ---, 2023 WL 4677722, at *4–5 (describing how AMC twice withdrew proposed amendments to increase the authorized shares of common stock after it learned they would not be approved by the stockholders (footnotes omitted)).

[264] *See, e.g.*, Aug. 4, 2022 Form 8-A ("In the absence of specific instructions from holders of AMC Preferred Equity Units, the Depositary will vote the Preferred Stock represented by the AMC Preferred Equity Units evidenced by the receipts of such holders proportionately with votes cast pursuant to instructions received from the other holders of AMC Preferred Equity Units."); Deposit Agr. § 4.5 (providing for proportional voting); POB at 19; POB Ex. 20 at AMC_00019707–9708; Op. Compl. ¶ 20.

Proposals as compounded by the Deposit Agreement, and said as much in the December 21, 2022 Board meeting minutes.[265]

The defendants sought to overcome the stockholders' right to vote "no," and their right not to vote—their "rational apathy."[266] The Board's actions were similar in intention and effect to those in *Peerless*—it manipulated the corporate machinery to rig the Special Meeting vote to overcome common stockholder opposition and the defeating presence of nonvotes.[267] The creation and issuance of the APE units, together with the Deposit Agreement and the Antara Transaction, dictated the outcome of stockholder votes on the Proposals. The defendants purposefully diluted the common stockholders' votes to the point of meaninglessness.[268] Plaintiffs would

---

[265] *See* Op. Compl. ¶ 149; Dec. 21, 2022 Board Minutes at AMC_00005968 ("Mr. Aron outlined the voting dynamics for the special shareholder meeting indicating that there were presently considerably more APEs in the float than common stock, . . . and that the non-voting APE shares would be voted proportionately rather than as 'no votes', all of which [sic] factors gave AMC a good chance to secure approval for conversion.").

[266] *AMC*, --- A.3d ---, 2023 WL 4677722, at *5 & n.13.

[267] *Id.* at *10 ("A majority of common stockholders and a majority of the APE unitholders did not give any voting instructions at all, let alone in favor of the Proposals." (footnote omitted)); *id.* at *10 n.67; *Peerless*, 2000 WL 1805376, at *3–4 (adjourning the annual meeting while the polls were still open for non-routine Proposal 2, because the necessary beneficial owners did not vote at all).

[268] *Cf. Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285 (Del. Ch. Aug. 27, 1987) (concluding that a dilutive stock issuance was designed to thwart the stockholder franchise in a vote related to corporate control).

likely establish the defendants acted with a primary purpose of thwarting the common stockholder franchise.[269]

This leaves the question of whether the defendants could show their actions were reasonable in relation to their legitimate objective. The defendants assert they did what they did in 2022 because AMC was in dire financial straits after the COVID-19 pandemic, despite the contributions of retail investors. AMC's net loss for 2022 was "just shy of $1 billion,"[270] it was burdened by approximately $5.1 billion of costly debt and had to negotiate extensions of the suspension period for various financial payments, and its cash position deteriorated by approximately $961 million in 2022 despite the sale of APEs that year.[271] Unless revenue and attendance levels rose, "the failure to obtain additional liquidity through equity capital would

---

[269] The defendants assert the Proposals and the Conversion were designed to "simplify [AMC]'s capital structure" and resolve the disparity between the trading prices of APEs and common stock. DOB at 21 (internal quotation marks omitted) (quoting DOB, Ex. S, Ex. 99.1 to December 22, 2022 AMC Form 8-K at 2); DOB at 22. That may be: but the franchise conflict warranting enhanced scrutiny arises out of the issuance and weaponization of the APEs to pass the Proposals. The argument about the design of the Proposals and the Conversion goes to the defendants' justification for thwarting the franchise, not whether the defendants' purpose was to thwart the franchise. *See Peerless*, 2000 WL 1805376, at *11. The defendants' reliance on their justifications does not inform the conclusion that their primary purpose was to thwart the franchise. *See* DOB at 22.

[270] DOB at 5–6 (citing DOB, Ex. C, AMC Entertainment Holdings, Inc., Annual Report (Form 10-K) (Feb. 28, 2023) [hereinafter "Feb. 28, 2023 Form 10-K"], at 85); Feb. 28, 2023 10-K at 86.

[271] *Id.* at 6–7 (citing Feb. 28, 2023 Form 10-K at 23, 87).

likely result in bankruptcy."[272] AMC was "[l]eft without any other way to raise equity capital."[273]

At least at this stage of the proceedings, the defendants have shown AMC was losing money and needed to raise cash in 2022 when the directors guaranteed the vote on the Proposals, but not that bankruptcy was imminent. (Indeed, AMC is still a going concern.) Perhaps, in April 2023 at the preliminary injunction stage, the defendants would have been able to show that in 2022, AMC was in desperate need of cash, could only raise it through equity capital, and needed to do so promptly, lest AMC declare bankruptcy and all AMC investors lose their investment.[274] The defendants may have been able to show their actions were reasonable in relation to that legitimate objective. Plaintiffs' breach of fiduciary duty claim has merit, and therefore value.

---

[272] *Id.* at 7–8 (citing Feb. 28, 2023 Form 10-K at 2); Feb. 28, 2023 Form 10-K at 2 ("If we are unable to achieve significantly increased levels of attendance and operating revenues, we may be required to obtain additional liquidity. If such additional liquidity is not obtained or insufficient, we likely would seek an in-court or out-of-court restructuring of our liabilities, and in the event of such future liquidation or bankruptcy proceeding, holders of our Common Stock, AMC Preferred Equity Units, and other securities would likely suffer a total loss of their investment.").

[273] *Id.* at 9; *id.* at 2–3, 29.

[274] This analysis is distinct from the balance of the equities the Court would conduct in April 2023, when considering a preliminary injunction. I address this issue next.

78

### c) The Preliminary Injunction

Though Plaintiffs sought injunctive relief, the parties agree that a preliminary injunction enjoining the Proposals and the Conversion would have been unlikely. "This Court has broad discretion to grant or deny a preliminary injunction."[275] To obtain a preliminary injunction, the movant must demonstrate: "(i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction."[276] But a preliminary injunction "is not granted lightly," and "[t]he moving party bears a considerable burden in establishing each of these necessary elements."[277]

The parties predict the third element, the balance of the equities, would fail.[278] That factor requires the Court to "balance the plaintiff's need for protection against any harm that can reasonably be expected to befall the defendants if the injunction

---

[275] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010) (citing *Data Gen. Corp. v. Digit. Comput. Controls, Inc.,* 297 A.2d 437, 439 (Del. 1972)).

[276] *Pell*, 135 A.3d at 783 (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986)).

[277] *Fletcher Int'l*, 2010 WL 1223782, at *3 (alteration in original) (internal quotation marks omitted) (quoting *La. Mun. Police Empls.' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1185 (Del. Ch. 2007)).

[278] *E.g.*, POB at 37–39; DOB at 28–31.

is granted."[279]  The Court

> must be cautious that its injunctive order does not threaten more harm than good.  That is, a court in exercising its discretion to issue or deny such a . . . remedy must consider all of the foreseeable consequences of its order and balance them.  It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.[280]

The parties argued the equities might have balanced against an injunction for three reasons.  First, that "granting Plaintiffs injunctive relief would have meant overriding the will of holders of Common Stock and APEs, who voted overwhelmingly in favor" of the Proposals.[281]  I dispensed with this contention in the July 21 Opinion:  the instructed votes cast by each class for each proposal were not overwhelmingly in favor.[282]  Second, the parties assumed the Court would be

---

[279] *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *5 (Del. Ch. May 17, 2018) (internal quotation marks omitted) (quoting *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989)).

[280] *Id.* (alteration in original) (internal quotation marks omitted) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 839 (Del. Ch. 2011)).

[281] DOB at 30.

[282] *AMC*, --- A.3d ---, 2023 WL 4677722, at *10 n.67 ("The defendants continue to misrepresent the nature of the vote by including the uninstructed mirrored votes in the total. . . .  But only 45.80% and 45.39% of outstanding common stockholders and APE unitholders together instructed a vote in favor of the Share Increase Proposal and Reverse Split Proposal, respectively. . . .  This is hardly 'overwhelming' or 'resounding.'"); *id.* at *10 ("A majority of common stockholders and a majority of the APE unitholders did not give any voting instructions at all, let alone in favor of the Proposals."); *id.* ("[O]nly 25.54% of the outstanding common voted for the Share Increase Proposal, and 24.80% for the Reverse Split Proposal.").

reluctant to invalidate the APEs held by "innocent third parties."[283] I take Plaintiffs' positions at argument to provide that they sought invalidation of the APE units under Section 242, and not under their *Blasius* claim.[284] As explained, the Section 242 claim was meritless, so that injunction would have failed on the merits.

Finally, the parties contended an April 2023 injunction against the Proposals and the Conversion would do great financial harm to AMC, as it would prevent AMC from raising capital and paying down its debt. Plaintiffs' assessment of that harm has shifted over time. In February 2023, when Plaintiffs filed their *Blasius* claim, they presumably had a good faith belief that the defendants' 2022 actions were not reasonable in relation to a legitimate objective, namely passing the Proposals to raise essential cash for AMC. But in the summer of 2023, when Plaintiffs sought approval of their settlement, they argued an April 2023 injunction against the Proposals and the Conversion would have been inequitable as those measures were necessary to prevent AMC's demise at that time. I asked Plaintiffs to point the Court to what they learned in discovery that led them to change their perception as to whether stockholder approval of the Proposals was necessary to keep AMC afloat.[285] Plaintiffs did not identify anything in the record.[286]

---

[283] POB at 39; *see* DOB at 30–31.

[284] *See* Hr'g Tr. 48–49, 70, 183..

[285] Hr'g Tr. 92.

[286] *Id.* at 92–96; *id.* 96.

For their part, the defendants have consistently held the position that the Proposals and the Conversion were designed to, and must be effectuated promptly to, raise essential cash. As explained above, they provided evidence that in 2022, AMC had to either earn revenue or sell equity to raise cash. Once this litigation began, the defendants did not oppose Plaintiffs' motion to expedite, and initially advocated for a hearing on any preliminary injunction motion before the stockholder vote scheduled for March 14, 2023.[287] At that time, their concerns were expressed in terms of market uncertainty.[288] When the parties negotiated a settlement term sheet in early March, the defendants supported the settlement being conditioned on lifting the status quo order, enabling AMC to effectuate the Reverse Stock Split and Conversion promptly.[289] In early May, the defendants began voicing concerns that an injunction could "result in a bankruptcy or financial restructuring."[290] During a status conference held a few days later, the defendants requested that the Court truncate the settlement notice period, explaining that "from the perspective of capital raising, once we get into the late summer, that is typically a quiet period," and that

---

[287] D.I. 25 at 12 (advocating for a March 10 preliminary injunction hearing date and expressing a willingness to "engage in . . . highly expedited discovery").

[288] *Id.* at 16–17.

[289] D.I. 59 at Motion ¶ 23.

[290] D.I. 441 at 14.

the defendants were "a little worried about" this litigation "dragging into the fall."[291]

The defendants maintained this position through July, expressing that delays in effectuating the Reverse Stock Split and Conversion could lead to dilutive equity financing or bankruptcy.[292]

Had the defendants shown that an April preliminary injunction would put AMC into bankruptcy, the harm to the nonmovant would have been a very high hurdle for Plaintiffs to clear. Perhaps the defendants would have been able to make that showing. I conclude a preliminary injunction has a discounted value in Plaintiffs' "give."

### 2.    The Settlement Class's "Get"

The Proposed Settlement reallocates AMC's equity between its common stockholders and APE unitholders. If the Proposed Settlement is approved, the existing common stockholders will own a slightly bigger slice of the AMC pie at the expense of the APE unitholders. The Proposed Settlement thus ameliorates some of the dilution the APE issuances inflicted on the common stockholders. Without the Proposed Settlement, the existing common stockholders would own approximately 34.28% of AMC's equity after the Conversion and the former APEs unitholders

---

[291] D.I. 217 at 18.

[292] D.I. 593 ¶ 14; D.I. 595.

would own approximately 65.72%.[293] With the Proposed Settlement, the existing common stockholders would own approximately 37.15% of AMC's equity after the Conversion and the former APEs unitholders would own approximately 62.85%.[294] This 2.87% increase in ownership is the "get."

The precise value of that 2.87% at the Settlement Class Time is difficult to predict, and the record before me offers little help. Plaintiffs assert that the value of the Settlement Shares "exceeds $129 million," citing an expert affidavit.[295] That affidavit estimated the value of the settlement consideration based on the Company's market capitalization on April 28 and on May 3, relying on the trading price of APEs and common stock on those days.[296] The reliance on trading prices means that the value of Settlement Shares fluctuates depending on the date used and AMC's circumstances. For example, the affidavit concludes that if valued on April 28, the Settlement Shares are worth $124,916,286.34.[297] If valued based on the May 3 trading prices, the value increases to $129,067,486.45.[298] But an earlier affidavit,

---

[293] POB at 30–31; D.I. 206 at Affidavit of Patrick Ripley of Loop Capital Financial Consulting Services in Support of Plaintiffs' Motion to Lift Status Quo Order ¶¶ 3(b), 4(b) [hereinafter "Ripley Aff."].

[294] POB at 31; Ripley Aff. ¶¶ 3(c), 4(c).

[295] POB at 30 (emphasis omitted) (discussing Ripley Aff.).

[296] Ripley Aff. ¶ 2.

[297] Id. ¶ 3(c).

[298] Id. ¶ 4(c).

using the same methodology but March 30 prices, concluded the value was $113,986,741.82—$15 million less than Plaintiffs' May 3 high water mark.[299]

Picking between the proposed dates is necessarily arbitrary—AMC's market capitalization on April 28 is no more relevant to the value of the Settlement Shares than that of May 3.[300] And neither date seems to be a better choice than the date the Settlement Shares are issued or a date closer to that issuance. Plaintiffs' suggestion that the May 3 trading prices should be used to value the Settlement Shares lacks support. The parties have not supplied me with a way of determining the precise value of the settlement consideration. Regardless of the exact value, the historical range makes it clear that the Settlement Shares are a significant "get."

The long-term benefits of the Proposed Settlement to the class may be significant if, as the parties seem to agree, the Proposals and Conversion are presently key to AMC's survival even despite recent gains in revenue.[301] AMC's second quarter Form 10-Q, filed on August 8, 2023, reported that the Company

---

[299] D.I. 59 at Affidavit ¶ 6(c).

[300] The expert sent a native Excel file to the Court and the Special Master, which includes additional dates. Plaintiffs have not explained why any particular date should be chosen, and the defendants have not stated a position on this issue. The Special Master was skeptical of the May 3 valuation date, and proposed instead that "a reasonable approach to value the Settlement Shares in Plaintiffs' analysis is to consider a range, median, or average, rather than just a single date in time." Rpt. at 35–36.

[301] *See Infinity Broad.*, 802 A.2d at 290 (stating that the Court may consider the "probable long-term benefits of [a] settlement" when assessing whether the settlement is fair to the class).

experienced an over $225 million net loss from operating activities for the six months ending June 30, 2023.[302]  That same Form 10-Q disclosed that AMC has about $708 million in current assets.[303]  These facts may underpin the 10-Q's disclosure that "[t]he Company's current cash burn rates are not sustainable long-term."[304]  And, in AMC's words, its current assets are "dwarfed by its $11.4 billion in total liabilities."[305]  While the Company stated it believes it has sufficient cash and cash equivalents to "fund its operations and satisfy its obligations currently and through the next twelve months," it is unclear how long it can do so because the Company's cash burn rate "is uncertain due to limited ability to predict studio film release dates, the overall production and theatrical release levels, and success of individual titles."[306]

---

[302] AMC Entertainment Holdings, Inc., Quarterly Report (Form 10-Q) at 4 (Aug. 8, 2023) [hereinafter "Aug. 8 Form 10-Q"].  The Court takes judicial notice of AMC's public SEC filings. *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 351 n.7 (Del. 2017).

[303] Aug. 8 Form 10-Q at 5.

[304] *Id.* at 8.

[305] D.I. 593 ¶ 12.

[306] Aug. 8 Form 10-Q at 8.  To be sure, the Company generated net earnings of $8.6 million for the three months ended June 30, 2023, in contrast to a net loss of $235.5 million in the three months ended March 31, 2023.  *Compare id.* at 4, *with* AMC Entertainment Holdings, Inc., Quarterly Report (Form 10-Q) at 4 (May 5, 2023).  It appears that this increase was driven primarily by "the popularity of film product compared to the prior year" and higher food and beverage sales, which was driven at least partially by the increase in admissions. *Id.* at 43.  Nevertheless, AMC reported current assets of $ 707.7 million for the three months ending June 30, 2023, as compared to the $740.5 it reported for the three months

Against this backdrop, the defendants anticipate the Company will have to raise additional capital through equity sales to stave off bankruptcy and remain in compliance with its loan covenants.[307] If AMC cannot raise enough cash to pay its debts and enters bankruptcy, the class members will lose their investment. The Proposed Settlement gives the class more equity in a struggling company, and gives the Company a way to raise needed revenue.

In exchange for this increased slice of ownership in AMC as a going concern, the common stockholders would release all claims asserted in or relating to the allegations in the Allegheny complaint or the operative complaint "that relate to the ownership of Common Stock during the Class Period."[308] As explained, the Section 242 claim is worthless. The *Blasius* claim may very well have been defeated on the merits by the defendants showing their actions were reasonable in relation to the legitimate objective of raising essential capital. Or, if an injunction would have put AMC into bankruptcy, the equities might have foreclosed injunctive relief. Even

---

ending March 31, 2023. *Compare id.* at 5, *with* AMC Entertainment Holdings, Inc., Quarterly Report (Form 10-Q) at 5 (May 5, 2023).

Though these results were filed after briefing on the Proposed Settlement was complete, they reflect an earnings period that concluded on June 30, 2023. The defendants have represented as recently as July 26 that the Company's financial troubles persist. These financial results, alone, do not demonstrate the Company no longer has a need to raise equity financing in the short term.

[307] D.I. 593 at 13–14.

[308] D.I. 582, at Addendum to Stipulation and Agreement of Compromise, Settlement, and Release ¶ 1.

87

without a precise valuation of the Settlement Shares, releasing these claims in exchange for Settlement Shares and AMC's continued viability falls within a range of results that a reasonable disinterested person could accept.[309]

### E. Plaintiffs' Lead Counsel Is Granted Fees And Expenses.

This Court may award attorneys' fees to counsel whose efforts conferred a common benefit to the class.[310]  This principle applies to both financial and nonmonetary benefits.[311]  The determination of any attorney fee and expense award is within the Court's discretion.[312]  In setting fee awards, the Court of Chancery "must make an independent determination of reasonableness."[313]

When setting a fee award, the Court will generally follow the factors identified in the Delaware Supreme Court's *Sugarland* decision and relied on by subsequent decisions.[314]  The relevant factors here are:  (1) the size of the benefit achieved; (2) whether the plaintiffs can rightly receive all the credit for the benefit conferred or

---

[309] *See Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2012 WL 1655538, at *4 (Del. Ch. May 9, 2012).

[310] *See, e.g.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1255 (Del. 2012); *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989).

[311] *See, e.g.*, *EMAK*, 50 A.3d at 434.

[312] *Ams. Mining*, 51 A.3d at 1255; *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149–50 (Del. 1980).

[313] *Goodrich*, 681 A.2d at 1045–46.

[314] *See, e.g.*, *Sciabacucchi v. Salzberg*, 2019 WL 2913272, at *1 (Del. Ch. July 8, 2019) (quoting *Ams. Mining*, 51 A.3d at 1254), *judgment vacated on other grounds*, 2020 WL 1985048 (Del. Ch. Apr. 24, 2020).

only a portion thereof; (3) the time and effort of counsel; (4) the standing and ability of counsel; (5) the relative complexities of the litigation; (6) the stage at which the litigation ended; and (7) any contingency factor.[315]

The factors are not weighted equally. This Court has consistently noted that the most important factors in determining a fee award are the size of the benefit achieved, and whether the plaintiff can be credited for the benefit.[316] "Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the level of contingency risk actually involved in the case."[317] "Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike."[318]

---

[315] *Sugarland*, 420 A.2d 142.

[316] *E.g.*, *In re Plains Res. Inc.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005) ("The factors are: . . . (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof; and (vii) the size of the benefit conferred. The last two elements are often considered the most important." (footnote omitted) (citing *Sugarland*, 420 A.2d at 149–50)); *see also Gatz*, 2009 WL 1743760, at *3 ("This Court has consistently noted that the most important factor in determining a fee award is the size of the benefit achieved."); *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *8 (Del. Ch. Aug. 30, 2007) ("In determining the size of an award of attorney's fees, courts assign the greatest weight to the benefit achieved by the litigation." (citing *Sugarland*, 420 A.2d at 150)).

[317] *Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011) (citing *Gatz*, 2009 WL 1743760, at *3).

[318] *Id.*

Applying the *Sugarland* factors here, I find that they weigh in support of a smaller award than Plaintiffs' counsel suggest.[319]  I address each factor in turn.

### 1.       The Benefits Achieved And Credit For The Benefits Conferred

When considering the fee award, the Court looks at the benefit conferred on the company and its stockholders, and then awards a percentage of that the benefit's value based on a sliding scale keyed to the litigation's progress.[320]  Plaintiffs' counsel have asked for a $20 million fee award (inclusive of expenses)[321] paid separately, which could be between 15% and 27.5%, depending on the value of the benefit.[322] The quantifiable benefit from which the fee is calculated is limited to the Settlement Shares.  Plaintiffs refer to other "substantial non-monetary benefits" achieved in connection with the settlement, but they did not make any effort to meaningfully describe or value those benefits.[323]  Plaintiffs are properly credited with the Settlement Share benefits that would not have been conferred but for this litigation.

---

[319] The defendants take "no position on the fees."  Hr'g Tr. 197.

[320] *E.g.*, *Gatz*, 2009 WL 1743760, at *3; *Dell*, --- A.3d ---, 2023 WL 4864861, at *7.

[321] POB at viii, 11, 51.

[322] Rpt. at 81–82 (illustrating a range of values for the Settlement Shares and what percentage a $20 million fee would represent of those values).  These percentages are based on predicted Settlement Share values between approximately $53 million and approximately $113 million.  *Id.* at 82.

[323] POB at 59; *see also id.* at 57 (referring to "other noneconomic benefits of the settlement").

The next step is to set the percentage of that benefit counsel earned. While the "[o]ther *Sugarland* factors may cause the court to adjust the . . . fee up or down, . . . the starting point under *Americas Mining* is a percentage calculation. Under this method, the 'common fund is itself the measure of success.'"[324] A mid-stage settlement follows "multiple depositions and some level of motion practice."[325] An early-stage settlement precedes a mid-stage settlement.[326] "A logical point to start the late-stage phase is after the end of expert discovery."[327]

Delaware law uses different sliding scales depending on whether the fee is paid out of the common fund or paid separately (as when the common benefit is nonmonetary). "A common fund with a fee award paid separately is mathematically equivalent to a larger common fund with a lower percentage fee award coming out of the gross amount."[328] For example, if a monetary common fund is worth $100 million, and the plaintiff's counsel is awarded 15%, then the remaining corporate

---

[324] *Dell*, 2023 WL 4864861, at *7 (quoting *Ams. Mining*, 51 A.3d at 1259).

[325] *Id.* at *8 (internal quotation marks omitted) (quoting *Ams. Mining*, 51 A.3d at 1259–60).

[326] *Id.* (quoting *Ams. Mining*, 51 A.3d at 1259–60).

[327] *Id.* at *11; *id.* at *9 ("This case involved a late-stage settlement. The parties informed the court that they had reached an agreement in principle on November 16, 2022. That was nineteen calendar days before trial was scheduled to begin. The parties had submitted a fifty-three-page joint pre-trial order and filed their pre-trial briefs. Plaintiff's counsel filed a pre-trial brief that spanned 134 pages and contained 22,908 words. Plaintiff's counsel truly litigated until the eve of trial.").

[328] *Id.* at *34.

benefit allocated to the class is worth $85 million. The class receives the same amount from a $117.6 million monetary common fund if 15% is paid to the plaintiff's counsel out of that fund. If a nonmonetary common fund is worth $100 million, and the plaintiff's counsel is awarded 15% paid separately, then the benefit to the class is still worth $100 million.

Recently, *Dell* included the following chart illustrating fee award percentages based on when the litigation was settled, and how the fee is structured:[329]

| Stage of Case | *Americas Mining* Percentage | Paid Separately Percentage |
|---|---|---|
| Early | 10% to 15% | 9% to 13% |
| Mid | 20% to 25% | 16% to 20% |
| Late | 25% to 30% | 20% to 23% |
| Max | 33% | 25% |

Contrary to Plaintiffs' counsel's position, this matter did not settle "on the eve of a preliminary injunction hearing."[330] The parties sent the Court an April 3 letter indicating they had reached a term sheet; the preliminary injunction hearing was scheduled for April 27. The parties had not taken any depositions or filed their preliminary injunction briefs. The only motion the parties had to address before reaching their term sheet was a motion to intervene.[331] While the settlement

---

[329] *Id.* at *34.

[330] POB at 59.

[331] D.I. 15. Plaintiffs submitted a fifteen-page opposition. D.I. 26. The Court denied the motion without argument. D.I. 37.

followed highly expedited written and document discovery, the settlement is still an early-stage settlement. The most justifiable "paid separately" percentage is 13%.[332] The fee calculation will start from that figure.

### 2. Secondary *Sugarland* Factors

"Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the level of contingency risk actually involved in the case."[333]

"All else equal, litigation that is challenging and complex supports a higher fee award."[334] This litigation was both complex and challenging. Plaintiffs filed claims applying a novel legal theory, crafted in a changing legal landscape, to sophisticated financial engineering.[335] Plaintiffs' counsel also undertook the challenging task of engaging with unprecedented putative class participation. They absorbed, processed, catalogued, and distributed thousands of putative stockholder

---

[332] *Dell*, 2023 WL 4864861, at *34.

[333] *Judy v. Preferred Commc'n Sys., Inc.*, 2016 WL 4992687, at *15 (Del. Ch. Sept. 19, 2016) (citing *Gatz*, 2009 WL 1743760, at *3).

[334] *Activision*, 124 A.3d at 1072.

[335] During the pendency of this litigation, this Court issued a ruling concerning the scope of Section 242 in *In re Snap Inc. Section 242 Litigation*, the Delaware Supreme Court issued *Coster IV*, and Delaware's General Assembly passed amendments to Section 242. *In re Snap*, Consol. C.A. No. 2022-1032-JTL, D.I. 22; *Coster IV*, --- A.3d ---, 2023 WL 4239581; Del. S.B. 114, 152d Gen. Assem., 84 Del. Laws ch. 98 (2023).

communications. Plaintiffs' counsel also had to endure the challenges of security threats to themselves and their staff. This factor warrants an upward adjustment.

Counsel may be "entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis."[336] "Fee awards should encourage future meritorious lawsuits by compensating the plaintiffs' attorneys for their lost opportunity cost (typically their hourly rate), the risks associated with the litigation, and a premium."[337] "But just because a lawyer works on contingency does not automatically warrant a significant award. 'Not all contingent cases involve the same level of contingency risk.'"[338] Cases that are "relatively safe in terms of forcing a settlement," like claims only for additional disclosures, do not face significant contingency risk.[339] This was not one of those cases.

---

[336] *Ryan*, 2009 WL 18143, at *13.

[337] *Franklin Balance Sheet*, 2007 WL 2495018, at *12 (footnote omitted) (citing *Seinfeld v. Coker*, 847 A.2d 330, 333–34 (Del. Ch. 2000)).

[338] *Sciabacucchi*, 2019 WL 2913272, at *7 (quoting *Activision*, 124 A.3d at 1073).

[339] *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1140 (Del. Ch. 2011) (internal quotation marks omitted) (quoting *Cox Radio*, 2010 WL 1806616, at *21); *Schumacher v. Loscalzo*, 2023 WL 4842103, at *5 (Del. Ch. July 28, 2023) ("A reduction of the $475,000 [fee] sought is also supported by the remaining *Sugarland* factors. The case was low risk, settled early, and was neither difficult nor complicated. '"It offered a ready-made settlement opportunity" and was filed "with an obvious and well-marked exit in sight."'" (quoting *Sciabacucchi v. Howley*, 2023 WL 4345406, at *5 (Del. Ch. July 3, 2023))).

### 3. The Time And Effort Expended, And The Standing And Skill Of Counsel

The time and effort expended by counsel is another secondary, or even tertiary, consideration to the benefits achieved.[340] Delaware courts regard this consideration as a crosscheck to guard against windfall awards,[341] "because the real measure of a fee award lies in the results achieved."[342] Courts have repeatedly acknowledged the shortcomings of the lodestar method, which can incentivize attorneys to inflate hours or billing rates.[343] Accordingly, Delaware courts should first look to precedents on which to base a fee award, which I have done.[344] Plaintiffs' counsel spent 3,425.9 hours on this case through May 1,[345] but I give no

---

[340] *E.g.*, *Pontiac Gen. Empls. Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, D.I. 49, at 40 (Del. Ch. May 8, 2015) (TRANSCRIPT); *Sciabacucchi*, 2019 WL 2913272, at *6.

[341] *Olson*, 2011 WL 704409, at *8 (citing *Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 396 (Del. Ch. 2010)).

[342] *Sciabacucchi*, 2019 WL 2913272, at *6.

[343] *E.g.*, *id.* (quoting *Sauer-Danfoss*, 65 A.3d at 1138).

[344] *See, e.g.*, *id.*

[345] D.I. 206 at Affidavit of Mark Lebovitch in Support of Proposed Settlement, Application for Attorneys' Fees and Expenses, and Incentive Award for Plaintiffs ¶ 3 (affirming Bernstein Litowitz Berger & Grossmann LLP devoted 1,438.50 hours on this action through May 1, 2023); D.I. 210 at Corrected Affidavit of Michael J. Barry in Support of Plaintiffs' Request for an Award of Attorneys' Fees and Expenses ¶ 4 (affirming Grant & Eisenhofer, P.A. devoted 720 hours on this action through May 1, 2023); D.I. 206 at Affidavit of Thomas Curry in Support of Plaintiffs' Request for an Award of Attorneys' Fees and Expenses ¶ 4 (affirming Saxena White P.A. devoted 627.75 hours on this action through May 1, 2023); D.I. 206 at Affidavit of William J. Fields in Support of Plaintiffs' Request for an Award of Attorneys' Fees and Expenses ¶ 5 (affirming Fields Kupka & Shukurov LLP devoted 544.50 hours on this action through May 1, 2023); D.I. 206 at Affidavit of Jeremy Friedman in Support of Plaintiffs' Request for an Award of Attorneys'

95

weight to the hours expended.[346]

As explained, the standing and skill of counsel is a secondary factor. Plaintiffs' counsel are well known to the Court. But in considering Plaintiffs' counsel's effort and standing, I find it necessary to consider what they have described as "missteps."[347] "Law firms establish a track record over time, and they 'build (and sometimes burn) reputational capital.'"[348] From my perspective, potential "missteps" include but are not limited to: failing to abide by the Court's practice of prompt responses to motions in expedited litigation, putting the Court in the burdensome position of having to urge responses;[349] noncompliance with

---

Fees and Expenses ¶ 4 (affirming Friedman Oster & Tejtel PLLC devoted 39.25 hours on this action through May 1, 2023); D.I. 206 at Affidavit of Richard A. Maniskas in Support of Proposed Settlement, Application for Attorneys' Fees and Expenses, and Incentive Award for Plaintiffs ¶ 3 (affirming RM LAW P.C. devoted 55.9 hours on this action through May 1, 2023); PRB at 59 ("Plaintiffs' counsel do not seek fees for post-settlement hours . . . .").

[346] *E.g.*, *Olson*, 2011 WL 704409, at *15; *see also Ams. Mining*, 51 A.3d at 1257 ("*Sugarland* does not require, as the Defendants argue, courts to use the hourly rate implied by a percentage fee award, rather than the benefit conferred, as the benchmark for determining a reasonable fee award. To the contrary, in *Sugarland*, this Court refused to adopt the Third Circuit's lodestar approach, which primarily focuses on the time spent.").

[347] Hr'g Tr. 8 ("I know that we've had some missteps . . . .").

[348] *Dell*, 2023 WL 4864861, at *32 ("Law firms establish a track record over time, and they 'build (and sometimes burn) reputational capital.'" (internal quotation marks omitted) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *9 (Del. Ch. Dec. 31, 2010))).

[349] *E.g.*, D.I. 90 (reminding the parties to respond to motions); D.I. 163 (asking the parties if they were going to file the settlement papers for the proposed settlement they had announced nearly two weeks prior).

specific instructions;[350] making misrepresentations to the Court and the class; and antagonism toward absent putative class members. While I will not discuss them all here, I will focus on a few.

First, it appears Plaintiffs' counsel failed to disclose a 2021 order from a California federal judge that required Bernstein Litowitz Berger & Grossman LLP ("BLBG") "in future cases . . . seeking appointment as class counsel" to notify courts of his decision criticizing BLBG's failure to disclose a potential conflict.[351] Plaintiffs' counsel did not notify this Court of that decision when it sought appointment as lead counsel or in Plaintiffs' opening brief in support of the Proposed Settlement. And while Plaintiffs' counsel did discuss the related Chancery case in Plaintiffs' reply brief in support of the settlement, Plaintiffs' counsel failed to disclose the federal court's order or address that Izzo raised it in her Objection.[352] This lack of candor to the Court is unacceptable.

---

[350] D.I. 454 at 5 n.21 ("I repeat my insistence that the parties update the specified websites today, and every day a noted report or order is issued, to comply with paragraph 72 of the notice."); D.I. 312 at 2–3 ("Before diving into the details, I pause on the Special Master's observation that the parties filed the exhibits to their settlement briefs confidentially, contrary to my instructions. More fundamentally, I insist that counsel and AMC update their websites today to post the materials promised in paragraph 72 of the notice sent to stockholders." (footnote omitted)); *accord* D.I. 587 at 4 n.13.

[351] *SEB Invs. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996, at *2 (N.D. Cal. Apr. 20, 2021). This action is C.A. No. 3:18-cv-02902 in front of Judge Alsup. *Id.*

[352] PRB at 56 (citing *In re Symantec Corp. S'holder Deriv. Litig.* C.A. No. 2019-0224-JTL, D.I. 100, at 42–43 (Del. Ch. May 4, 2023) (TRANSCRIPT)); *Symantec*, C.A No. 2019-0224-JTL, D.I. 100 (discussing the "Securities Action" that settled in February 2022 in

Plaintiffs' counsel also misrepresented in Plaintiffs' opening brief in support of the Proposed Settlement that one of their clients at the time signed a Rule 23 affidavit in support of the Proposed Settlement: he had not.[353] They also delayed responding to Izzo's counsel when they inquired about the nonexistent affidavit.[354] This issue caused consternation and burdened the Court.

Finally, Plaintiffs' counsel seemed at times to forget its role as counsel for the putative class. As one example, Plaintiffs' counsel broadcast a private disagreement between an absent putative class member and counsel.[355] As another, they repeatedly failed to serve objectors.[356] These issues also were a net negative on the progress of this litigation.

The burnt reputational capital in this action warrants a downward adjustment to the fee award.

\* \* \*

---

front of Judge Alsup in the Northern District of California); *In re Symantec Corp. S'holder Deriv. Litig.* C.A. No. 2019-0224-JTL, D.I. 1 at 1 (Del. Ch. Mar. 20, 2019) (disclosing a related securities action, case number 3:18-cv-02902, then pending in the Northern District of California).

[353] POB at 51 n.122 (citation reading "See [sic] Affidavits of Munoz, Franchi, and Allegheny.").

[354] D.I. 369 at 2 (citing D.I. 357 ¶¶ 8–9).

[355] D.I. 306 at 3–4.

[356] D.I. 369 at 2 (citing D.I. 344 at 5, and D.I. 357 ¶ 9); D.I. 580 ¶ B n.4 (citing D.I. 550 at Certificate of Service, and D.I. 575 at 6).

"In these circumstances, it is within the Court of Chancery's discretion to reduce class counsel's fee award."[357] Plaintiffs' counsel is awarded fees and expenses of 12% of the recovery at the Settlement Class Time.

As explained, the value of the recovery, i.e. the Settlement Shares, is difficult to precisely quantify today. And as explained, it is unnecessary and arbitrary for the Court to select one of Plaintiffs' proposed dates to value the recovery in this matter for purposes of evaluating the settlement terms.

I find I need not predict the value of the Settlement Shares to set a dollar amount for Plaintiffs' counsel's fee, either. The recovery is sourced wholly in the Settlement Shares, which will be publicly traded. That recovery will be paid "promptly" after the Reverse Stock Split and the Conversion are completed.[358] And that recovery will be paid soon: the defendants have consistently maintained they intend to pursue the Proposals and Conversion promptly upon settlement approval. As explained below, I have declined to enjoin them from doing so pending Izzo's appeal of the July 21 Opinion.

Under these circumstances, speculating as to the future value of a share of AMC common stock makes little sense. I leave it to the parties to confer on the

---

[357] *In re Coleman Co. Inc. S'holders Litig.*, 750 A.2d 1202, 1212 (Del. Ch. 1999) (collecting cases).

[358] Notice ¶ 48.

value of the Settlement Shares as crystallized at the time those shares are issued, and on what 12% of that value represents. The parties should derive Plaintiffs' counsel's fee from the closing price of AMC common stock on the date Settlement Shares are issued. The parties should make any necessary adjustments to account for dilution to the legacy common stockholders, perhaps in the same manner as Plaintiffs' expert, to the extent that the stock price does not reflect any such dilution. In no event shall the fee and expenses exceed $20 million, per the agreement reflected in the Notice.[359]

### F. Plaintiffs Are Granted Incentive Awards Out Of The Fee Award.

Plaintiffs seek approval of modest $5,000 incentive awards to Franchi and Allegheny, to be paid exclusively out of any fees awarded to Plaintiffs' counsel.

Public policy favors granting incentive awards. "Compensating the lead plaintiff for efforts expended is not only a rescissory measure returning certain lead plaintiffs to their position before the case was initiated, but an incentive to proceed with costly litigation (especially costly for an actively participating plaintiff) with uncertain outcomes."[360] The Court may grant incentive awards to representative plaintiffs where justified by the factors identified in *Raider v. Sunderland*: (i) the

---

[359] *Id.* ¶ 53.

[360] *Raider*, 2006 WL 75310, at *1 (footnote omitted).

100

"time, effort, and expertise expended by the class representative," and (ii) the "benefit to the class."[361]

Here, Plaintiffs meet the *Raider* factors. Franchi served a demand under 8 *Del. C.* § 220, which this Court encourages as a tool to gather information before initiating a plenary lawsuit.[362] Both Plaintiffs produced documents in discovery. Allegheny, in producing documents, "conducted electronic searches of emails and texts, and also searched and produced hard copy documents."[363] Franchi "searched for and produced documents and trading records."[364] Allegheny's representative met with counsel and prepared for a deposition before it was cancelled.[365] As explained, Plaintiffs should receive credit for conferring a benefit to the class. The size of the benefit does not factor into my calculations on their incentive awards. In typical

---

[361] *Id.* at *1; *accord Morrison v. Berry*, 2021 WL 2926138, at *1 (Del. Ch. July 12, 2021).

[362] *E.g.*, *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006) (recognizing Delaware Courts' encouragement to stockholders to use books and records demands as one of the "tools at hand" before filing representative litigation (footnote omitted)).

[363] POB at 61.

[364] *Id.* at 61.

[365] *Id.* at 61–62.

baseline circumstances, an incentive award of $5,000 rewards competent participation.[366] Here, $5,000 incentive awards are appropriate, if low.[367]

### G. Izzo's Request For A Stay Pending Appeal Is Denied.

Having approved the settlement, I now turn to Izzo's motion seeking a stay such that the status quo order would remain in place pending an appeal, which Izzo states is forthcoming.[368] Plaintiffs and the defendants responded on July 25 and 26,

---

[366] *See, e.g.*, *In re Galena Biopharma, Inc.*, Consol. C.A. No. 2017-0423-JTL, D.I. 69 at 83–84 (Del. Ch. June 14, 2018) (TRANSCRIPT) (awarding $5,000 incentive fee for named plaintiff who did not sit for a deposition and characterizing $1,000 to $5,000 "nominal awards [as] understandable and appropriate"); *Spritzer v. Aklog*, C.A. No. 2020-0935-KSJM, D.I. 29 at 44 (Del. Ch. Nov. 3, 2022) (TRANSCRIPT) (awarding $2,000 for plaintiff who did not participate in discovery and observing that awards of that magnitude incentivize "plaintiffs who are willing to put their names on the papers . . . when they know that they have to monitor litigation and may be called to sit for depositions and other forms of discovery and relief"); *In re Homefed Corp. S'holder Litig.*, 2022 WL 489484, at *4 (Del. Ch. Feb. 15, 2022) (ORDER) (awarding a $5,000 incentive award to each co-lead plaintiff); *In re: Pivotal Software, Inc. S'holders' Litig.*, 2022 WL5185565 (Del. Ch. Oct. 4, 2022) (awarding a $10,000 incentive award to the plaintiff); *In Re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, Consol. C.A. No. 2017-0486-SG, D.I. 750 ¶ 13 (same) (Dec. 27, 2022) (ORDER).

[367] Had Plaintiffs asked for larger incentive awards, the nature of this litigation would have supported their award. Plaintiffs, like their counsel and the Court, were subject to an unusual level of harassment from the time of filing the complaints throughout this settlement process. POB at 62; Allegheny Aff. ¶ 7; Second Franchi Aff. ¶ 6. Plaintiffs' counsel speculated that harassment led Munoz to effectively withdraw from his role as plaintiff. D.I. 366 ¶¶ 3, 7; *see also* D.I. 366, Ex. A.

[368] Because the Court has not yet approved the amount of Plaintiffs' counsel's fees, neither this decision nor the order issued with it are final; any appeal would be interlocutory. *See Del. Tech. & Cmty. Coll. v. State of Del. Hum. Rels. Comm'n*, 2017 WL 2180544, at *5 (Del. Super. May 17, 2017); *In re Tex. E. Overseas, Inc.*, 2009 WL 5173805, at *2 (Del. Ch. Dec. 23, 2009) ("[T]here is no order from which an appeal may be taken and, thus, any motion for a stay pending appeal is not yet ripe."). Nevertheless, for the sake of ensuring the parties can perform the settlement obligations in a prompt manner, I assume for

respectively, opposing the request,[369] and Izzo filed a reply on July 31.[370]  Izzo's

request for a stay is governed by Court of Chancery Rule 62(b), which provides:

> In its discretion and on such conditions for the security of the adverse
> party as are proper, the Court may stay the execution of or any
> proceedings to enforce a judgment pending the disposition of a motion
> for a new trial or to alter or amend a judgment made pursuant to Rule
> 59, or of a motion for relief from a judgment or order made pursuant to
> Rule 60.[371]

Rule 62(d) states that "[s]tays pending appeal and stay and cost bonds shall be

governed by article IV, § 24 of the Constitution of the State of Delaware and by the

Rules of the Supreme Court."[372]  Supreme Court Rule 32(a) provides that "a motion

---

purposes of this analysis that Izzo would file an interlocutory appeal, and would meet the requirements in this Court and the Delaware Supreme Court for an interlocutory appeal.

Izzo has not filed an appeal, interlocutory or otherwise, so under most circumstances, her motion for a stay pending appeal would not be ripe.  On July 26, the defendants submitted a letter expressing a need to consummate the Reverse Stock Split and Conversion as quickly as possible so that the Company can raise additional capital through the sale of common stock.  D.I. 595.  That letter also stated that the Company was required to give ten days' notice to the New York Stock Exchange "before effecting the reverse stock split and conversion" and that the Company has a financial need to sell additional stock before the last two weeks of August, as those weeks are "are a historically quiet period in the financial markets." *Id*. at 4.  Under these circumstances, deciding the motion now is appropriate, as it avoids further delay.  *See XL Specialty Ins. Co. v. WMI Liquidating Tr*., 93 A.3d 1208, 1217 (Del. 2014) ("A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court 'in postponing review until the question arises in some more concrete and final form.'" (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989)).

[369] D.I. 589 ¶¶ 6–13; D.I. 593.

[370] D.I. 604.

[371] Del. Ch. Ct. R. 62(b).

[372] Del. Ch. Ct. R. 62(d).

for stay must be filed in the trial court in the first instance" and "[a] stay or an injunction pending appeal may be granted or denied in the discretion of the trial court."[373]

In deciding whether to grant an injunction, the Court considers what are referred to as the *Kirpat* factors:

> (i) the likelihood of success on the merits of the appeal; (ii) whether [the moving party] would suffer irreparable harm if the stay was not granted; (iii) whether [any interested party] would suffer substantial harm if the stay was granted; and (iv) whether the public interest would be served if the stay was granted.[374]

"No one factor is dispositive; rather, the Court will carefully weigh all relevant considerations."[375] When a litigant seeks a stay pending appeal, she bears the burden of showing the stay is warranted.[376]

The first *Kirpat* factor is whether the litigant seeking a stay has demonstrated a likelihood of success on appeal.[377] A likelihood of success will be shown if the party seeking the stay "has presented a serious legal question that raises a 'fair

---

[373] Del. Supr. Ct. R. 32(a).

[374] *Homestore, Inc. v. Tafeen*, 886 A.2d 502, 504 (Del. 2005) (citing *Kirpat, Inc. v. Del. Alcoholic Bev. Control Comm'n*, 741 A.2d 356 (Del. 1998)).

[375] *Wynnefield P'rs Small Cap Value L.P. v. Niagara Corp.*, 2006 WL 2521434, at *1 (Del. Ch. Aug. 9, 2006).

[376] *See Zhou v. Deng*, 2022 WL 1617218, at *2 (Del. Ch. May 23, 2022) (quoting *Lynch v. Gonzalez*, 2020 WL 5648567, at *4 (Del. Ch. Sept. 22, 2020)).

[377] *Homestore*, 886 A.2d at 504 (citing *Kirpat*, 741 A.2d 356).

ground for litigation and thus for more deliberative investigation.'"[378]  In determining whether this standard is met, our courts have considered, among other things, whether the issue raised is novel and whether an unsettled area of Delaware law is involved in the adjudication of the issue.[379]

The only issue Izzo identified for appeal concerns whether the Release is properly interpreted as encompassing future claims.[380]  Izzo objected to the Proposed Settlement on the basis that the Release encompassed claims "based on a set of operative facts that will occur in the future."[381]  The July 21 Opinion rejected her argument, reasoning that her "reading misinterprets the Release," which included

---

[378] *Kirpat*, 741 A.2d at 358 (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

[379] *See id.* at 358 (finding a likelihood of success on appeal where the appellant raised an issue of first impression); *Gans v. MDR Liquid. Corp.*, 1999 WL 669364, at *1 (Del. Ch. Aug. 17, 1999) (declining to find likelihood of success where the appeal presented "no issues of first impression [and involved no] unsettled areas of Delaware law").

[380] Of course, Izzo identified this issue to appeal before this opinion was published.

[381] Izzo Obj. at 33 (internal quotation marks omitted) (quoting *Griffith v. Stein ex rel. Goldman Sachs Grp., Inc.*, 283 A.3d 1124, 1134 (Del. 2022))).  It is strange that Izzo would appeal the Court's July 21 Opinion on this basis.  Izzo correctly identifies that it would be problematic for the Release to encompass claims arising from events or actions that have not yet occurred. *Griffith*, 283 A.3d at 1134 (quoting *Phila. Stock Exch.*, 945 A.2d at 1146).  The defendants asserted that the Release does not encompass such claims, arguing that the Release's language "makes clear that [it] does not apply to future events." D.I. 441, at Defendants' Reply Brief in Further Support of Proposed Settlement, at 21–22.  And the July 21 Opinion held that the Release did not encompass future claims. *AMC*, 2023 WL 4677722, at *24 n.186.  Any party wielding the Release to defeat a "future claim" would have to overcome this holding, as well as the defendants' statements that it did not apply.

"two limitations [that] make clear the Release does not apply to future events."[382]

Izzo's motion raises only an ordinary question of contract interpretation,[383] and is therefore insufficient to establish "a fair ground for litigation and thus for more deliberative investigation."[384]

As for the second *Kirpat* factor, Izzo will suffer irreparable harm if a stay is not granted. Approval of the Proposed Settlement will lift the status quo order.[385] Once the status quo order is lifted, the Company is free to effectuate the Reverse Stock Split and Conversion, and I read the defendants' July 26 letter as expressing an intention to do so as quickly as possible.[386] Post-Conversion, the converted shares

---

[382] *AMC*, 2023 WL 4677722, at *24 n.186.

[383] *Fox v. Paine*, 2009 WL 147813, at *5 (Del. Ch. Jan. 22, 2009) ("A settlement agreement is construed using contract interpretation principles."), *aff'd*, 981 A.2d 1172 (Del. 2009).

[384] *Zohar Cdo 2003-1, LLC v. Patriarch P'rs, LLC*, 2016 WL 6661932, at *1 (Del. Ch. Nov. 10, 2016) ("Patriarch's arguments on appeal will not present issues of first impression or pressing issues of Delaware law for resolution by the Supreme Court. Rather, Patriarch's arguments involve straightforward issues of contract interpretation. Therefore, Patriarch's appeal does not present 'a fair ground for litigation and . . . more deliberative investigation.'" (alteration in original) (footnote omitted) (quoting *Kirpat*, 741 A.2d at 358); *Frankino v. Gleason*, 1999 WL 1063071, at *2 (Del. Ch. Nov. 12, 1999) (declining to find likelihood of success because case involved "straightforward application of the contract law principles employed when interpreting bylaw provisions"); *Gans*, 1999 WL 669364, at *1 (same). I reject Izzo's suggestion that because aspects of this case are "unprecedented," any issues Izzo may raise on appeal are issues of first impression. D.I. 604 ¶ 5 ("Unless the settlement is rejected, any subsequent opinion and final order in an unprecedented case will undoubtedly raise further substantial questions deserving attention from the Delaware Supreme Court.").

[385] Stip. ¶ 4.

[386] *See* D.I. 595 at 4.

will be freely traded on the New York Stock Exchange, and will likely change hands before a final appellate decision is rendered. It will, as a practical matter, be difficult, if not impossible, to unwind those transactions if our Supreme Court finds that the Release is overbroad and that the settlement should be rejected.[387]

But the harm to the Company, and therefore to its stockholders (including Izzo), would be even greater if this action is stayed pending appeal, and so the third *Kirpat* factor weighs heavily against issuing a stay. The defendants anticipate the Company will have to raise additional capital through equity sales to stave off bankruptcy and remain in compliance with its loan covenants.[388] As explained above, AMC's second quarter financials reveal a continued need to sell equity to raise cash despite recent earnings.[389]

Lifting the status quo order enables the consummation of the Reverse Stock Split and Conversion, which will free up additional common stock for sale. If the

---

[387] *See Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000) ("A significant delay . . . without more, will normally make impractical any rescission of a corporate transaction, particularly one involving publicly traded securities."); *Winston v. Mandor*, 710 A.2d 831, 834 (Del. Ch. 1996) ("[T]he practical difficulties of undoing purchases made by good faith purchasers for value on a national securities exchange lends additional weight to defendants' position."); *see also Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 603 (Del. Ch. Jan. 10, 1974) ("While the remedy of rescission is available, it is not difficult to imagine the various obstacles to such a remedy including, tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed." (citation omitted)), *aff'd*, 316 A.2d 619 (Del. 1974).

[388] D.I. 593 at 13–14.

[389] *See supra,* notes 3023–307, and accompanying text.

Company filed for bankruptcy before an appellate decision were issued, both the common stockholders and APE unitholders would almost certainly suffer a complete loss of their investment.

If those transactions are not completed, the Company may have to sell additional APEs, which would harm AMC's common stockholders. And APEs have traded at a significant discount to the Company's common stock, meaning such APE sales would be far more dilutive than the sale of common stock.[390] Because the settlement consideration partially remedies the dilution caused by previous APE issuances through what is essentially a reallocation of value between the common shares and APEs,[391] the sale of additional APEs pending appeal would reduce the value of the settlement consideration. Under these circumstances, the harm to the

---

[390] For example, on August 4, 2023, AMC common stock closed at a price of $4.90 per share while APE closed at $1.73 per unit. *AMC Ent. Hldgs., Inc. Class A Common Stock Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/amc/historical (last visited Aug. 9, 2023); *AMC Ent. Hldgs., Inc. AMC Preferred Equity Units Historical Data*, Nasdaq, https://www.nasdaq.com/market-activity/stocks/ape/historical (last visited Aug. 9, 2023). The Court may take judicial notice of these securities' prices because such prices are facts that "are not subject to reasonable dispute." *Lee v. Pincus*, 2014 WL 6066108, at *4 n.11 (Del. Ch. Nov. 14, 2014).

[391] *AMC*, 2023 WL 4677722, at *12 ("The Proposed Settlement has the practical effect of reallocating the ownership of AMC's equity between its common stockholders and the APE unitholders.").

Company and its stockholders far outweighs the harm to Izzo, which counsels against granting the stay.[392]

Finally, I turn to the last *Kirpat* factor, which is whether the grant of a stay would favor the public interest.[393] Izzo argues "an appeal will raise at least one, and likely several, important questions which the Delaware Supreme Court should have the opportunity to consider."[394] I disagree. The only issue identified by Izzo is whether this Court should have interpreted the Release as encompassing claims based on future events or conduct, which is an issue of contract interpretation. Izzo has failed to identify any public interest that would be served by granting a stay.

Thus, even though Izzo would face irreparable harm absent a stay, she has failed to show a likelihood of success and the Company and its stockholders would face substantial harm if a stay were granted. Applying the *Kirpat* factors holistically, I find that Izzo has not carried her burden, and her motion is denied.[395]

---

[392] *Zohar*, 2016 WL 6661932, at *2 (denying motion for stay where the harm to the interested parties outweighed the harm to the moving party). I also reject Izzo's suggestion that the Company will not face substantial harm because it "has multiple short-term financing options." D.I. 583 ¶ 21. This is apparently based solely on a January 2023 Antara debt proposal, which the Company rejected. *Id.* (citing D.I. 556); D.I. 556 at 22–24 (citing PRB, Ex. 10). Izzo has not shown that such an offer would still be available, and that if it were available, that the terms would be more favorable to the Company and its stockholders than APE equity financing option.

[393] *Homestore*, 886 A.2d at 504 (citing *Kirpat,* 741 A.2d 356)).

[394] D.I. 583 ¶ 22.

[395] Because the stay is denied, I need not address the supersedes bond issue. "The primary purpose of the security, or supersedeas bond, is to protect the appellee from losing the

109

## III. CONCLUSION

For the forgoing reasons, the Proposed Settlement is approved, Plaintiffs' counsel are awarded a 12% fee award, and Plaintiffs are awarded $5,000 incentive awards out of their counsel's fee award.

---

benefit of the judgment through the delay or ultimate non-performance by the appellant." *DiSabatino v. Salicete*, 681 A.2d 1062, 1066 (Del. 1996). Nevertheless, I note that a meaningful bond would be required in light of the Company's present circumstances. *See Zimmerman v. Crothall*, 2014 WL 257461, at *2 (Del. Ch. Jan. 23, 2014) ("Here, Defendants have not demonstrated that posting security in an amount that is less than the amount of the Judgment sufficiently would protect the appellee, TWF. Indeed, they have stated that Adhezion is in dire financial condition . . . and will expend in the near future more than $1.8 million in cash on taxes and projects. These are the very circumstances that generally require the posting of security at least equal to the full amount of the Judgment to sufficiently protect against the risk of nonperformance by the appellant."); *see also* D.I. 593 ¶ 19 (speculating that the harm from dilutive APE financings would equal approximately $100 million per quarter).

110